SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**State v. James Buckner** (A-22-14) (074390)

**Argued April 28, 2015 -- Decided July 30, 2015**

**RABNER, C.J., writing for a majority of the Court.**

In this appeal, the Court considers whether temporary recall service by retired judges violates the mandatory retirement rule set forth in the Judicial Article of the State Constitution, which declares that "[t]he Justices of the Supreme Court and the Judges of the Superior Court . . . shall be retired upon attaining the age of 70 years." N.J. Const. art. VI, § 6, ¶ 3.

The constitutional question in this case arises out of defendant's indictment and trial for counts of robbery, aggravated assault, and related charges, all stemming from the March 2010 attack of a woman in a parking lot of the Morris County Mall. The Honorable Salem Vincent Ahto, a retired Superior Court Judge, presided at defendant's trial. Judge Ahto was 73 years old at the time. He had been recalled to service by the Supreme Court three times by orders dated June 24, 2008, June 29, 2010, and February 7, 2012.

Prior to trial, defendant moved to disqualify Judge Ahto, contending that (1) the Recall Statute, N.J.S.A. 43:6A-13 -- which allows retired judges to be recalled for temporary judicial service -- was unconstitutional, and (2) Judge Ahto should not decide the disqualification motion because the $300 per diem stipend paid to recall judges allegedly created a financial interest in the case. Judge Ahto denied both motions. After a three-day trial, a jury found defendant guilty of second-degree robbery, third-degree aggravated assault, and attempted theft. Judge Ahto sentenced defendant to nine years' imprisonment subject to the No Early Release Act, N.J.S.A. 2C:43-7.2.

Defendant appealed, arguing both that the trial judge erred in denying the disqualification motions and that his sentence was excessive. A divided Appellate Division panel affirmed defendant's conviction. State v. Buckner, 437 N.J. Super. 8 (App. Div. 2014). The panel found that Judge Ahto properly declined to recuse himself based on a purported financial interest in the case, and further upheld defendant's sentence. Id. at 37-38. The panel divided over the constitutionality of the Recall Statute. Evaluating defendant's claim under the Judicial Article, the majority upheld the constitutionality of the statute, finding "no language, express or even implied, banning the temporary recall of retired judges." Id. at 28. Among other conclusions, the majority rejected an argument raised by the dissent, not the parties: that recall service is unconstitutional because it improperly encroaches upon the Executive's power of appointment and thus violates the separation of powers doctrine. The majority found that the Recall Statute struck an appropriate compromise and maintained the balance among the three branches. Id. at 35.

The dissenting member of the panel concluded that the Recall Statute is unconstitutional. Id. at 39 (Harris, J.A.D., dissenting). In the dissent's view, the phrase "shall be retired upon attaining the age of 70 years" in the Judicial Article "connotes (1) the compulsory abdication of a judicial office; (2) the surrender of judicial power"; and (3) "the permanent loss of the ability to exercise -- for the benefit of the public -- the sovereign functions of government that had previously been made possible by the Governor's selection, with the advice and consent of the Senate." Id. at 42 (Harris, J.A.D., dissenting) (citation omitted).

Defendant appealed as of right under Rule 2:2-1(a)(2), based on the dissent in the Appellate Division.

**HELD:** Defendant has failed to show beyond a reasonable doubt that the Recall Statute is clearly repugnant to the New Jersey Constitution. To the contrary, the current law, in effect since 1975, is consistent with both the language and the history of the modern State Constitution, and does not violate the separation of powers doctrine.

1. A legislative act will not be declared void unless its repugnancy to the constitution is clear beyond a reasonable doubt. Silence typically cannot satisfy a challenger's heavy burden of proof. Unless prohibited by the Constitution

1

expressly or by clear implication, the Legislature has the power to take any action or course reasonably necessary or incidental to the operation of government. (pp. 16-18)

2. New Jersey has had three constitutions. The focus of this appeal is on the modern State Constitution, which was ratified by the voters in 1947 and took effect in 1948. Before the trial court and the Appellate Division, defendant relied exclusively on Article XI of the Constitution -- the Schedule Article. As the majority and the dissent in the Appellate Division correctly noted, the Schedule Article has no bearing on this appeal because its provisions dealt exclusively with the incumbent judges who held their judicial offices at the adoption of the 1947 Constitution. Defendant's reliance on the Schedule Article is therefore misplaced. (pp. 19-20)

3. The proper focus of this appeal is the Judicial Article of the modern Constitution, which provides "The Justices of the Supreme Court and the Judges of the Superior Court shall hold their offices for initial terms of 7 years and upon reappointment shall hold their offices during good behavior . . . . Such justices and judges shall be retired upon attaining the age of 70 years. Provisions for the pensioning of the Justices of the Supreme Court and the Judges of the Superior Court shall be made by law." N.J. Const. art. VI, § 6, ¶ 3. The word "retired" is not incompatible with recall service. In the context of Paragraph 3, "retire" means an end to a seven-year or tenured term of service, and the start of "pensioning." Temporary recall service, by comparison, does not reverse a judge's retirement. Nor does it restore judges to their former position. Recall judges serve at the pleasure of the Supreme Court for two years, with duties often limited to participation in "special projects and programs." Recall judges remain retired and do not earn a judicial salary, but instead receive $300 per diem, not to exceed more than one-quarter of a judicial salary in a year. The Appellate Division dissent submits that recall clashes with retirement because "shall be retired" "connotes" the complete "surrender of judicial power" and "the permanent loss of the ability to exercise" the functions of a judge. Buckner, supra, 437 N.J. Super. at 42 (Harris, J.A.D., dissenting). But the dissent's far-reaching connotation finds no support in the text of the Constitution. The Judicial Article does not foreclose recall on a limited or temporary basis -- either expressly or by clear implication. (pp. 20-23)

4. The parties and the Appellate Division opinions also discuss the framers' choice to use different language in the Schedule and Judicial Articles. The difference in language reveals that the framers knew how to bar recall but chose not to do so in the Judicial Article. The first phrase of the Schedule Article -- no judge "shall hold his office after attaining the age of seventy years" -- banned recall, and the framers had to create an escape clause and expressly permit judges to complete their unexpired terms during the transition from the old to the new Constitution. The Judicial Article, by contrast, does not bar recall; it says that judges "shall be retired" at age seventy and subject to a pension. Had the framers intended to ban recall, they could have repeated the text used in Article XI. (pp. 23-25)

5. Because the language of the Constitution does not rule out recall, there is no need to turn to extrinsic sources. A close look at the constitutional proceedings, however, does not suggest that the framers wanted to restrict recall. Rather, the history of the Judicial Article shows that the framers considered various options including restrictive language in an early draft of the Constitution that barred recall, a revised draft that made recall mandatory, and varied proposals raised at the Constitutional Convention. Also, multiple individuals at the Convention offered positive comments about recall. The framers declined to act on the issue, opting instead to leave it to the Legislature. Defendant maintains that the framers expressly barred recall -- even though the Constitution does not say so, and nothing in the record of the proceedings suggests the framers had that in mind. The Constitution's silence is not a rejection of recall; instead it amounts to an appropriate delegation of authority to another branch of government. The emphasis at the Convention on both simplicity of language and the need for flexibility in the court system also supports the Court's analysis. (pp. 25-40)

6. Having addressed the Judicial Article, the Court turns to the history and purpose of the Recall Statute. The Legislature designed a pensioning system that today includes recall. Over time, the Legislature has acted on a number of occasions to permit the recall of retired judges, including in 1973, when the Legislature enacted the Judicial Retirement System Act ("JRSA"), N.J.S.A. 43:6A-1 to -46, leaving in place the recall provision enacted in a prior law. The Legislature took action again in 1975, amending the Recall Statute to permit the recall of retired judges older than seventy. N.J.S.A. 43:6A-13(b). Defendant suggests that the period from 1948 to 1973, when he claims there was no recall legislation, is proof that the framers did not intend recall. The argument's premise is flawed. The Legislature first enacted a recall provision in 1964, and, even more importantly, defendant's suspicion, based on a period of legislative inaction, is not enough to show unmistakably that the Recall Statute runs afoul of the

2

Constitution. If anything, the passage of time works against defendant's claim. Defendant must surmount the well-settled policy of our law not to invalidate a statute which has been in force without substantial challenge for many years, unless its unconstitutionality is obvious. (pp. 40-48)

7. The Court observes that the fifty states have adopted various approaches to judicial retirement and recall, but declines to rely upon the approaches taken by other states, noting that its obligation is to interpret the words and meaning of the New Jersey Constitution and New Jersey statutory law in light of the State's history. The approaches taken by others do not offer insight into what the framers of New Jersey's modern Constitution intended. (pp. 48-51)

8. Although defendant did not preserve the issue, he adopts an argument raised by the Appellate Division dissent, namely that the Recall Statute conflicts with the separation of powers doctrine. The Court concludes that the argument lacks merit. The separation of powers clause of the Constitution directs that one branch of government may not exercise powers that properly belong to another. As pertains to this appeal, the Constitution gives the Governor the power to nominate and appoint judges, subject to the advice and consent of the Senate. Recall does not limit or encroach on the Executive's power. The moment a judge retires, the position becomes vacant, and the Governor may appoint a new judge as a replacement. Because defendant cannot show that the Recall Statute clashes with or usurps the Governor's constitutional authority to appoint judges, the separation of powers argument fails. (pp. 52-53)

9. In short, this appeal is governed by two fundamental principles: the strong presumption of validity that attaches to every legislative enactment, and the Court's obligation to act with "extreme self restraint" before it overrides the Legislature and pronounces a law unconstitutional. Before a court can declare a law unconstitutional, it must find proof beyond a reasonable doubt that the statute is clearly repugnant to the New Jersey Constitution. Defendant has not met that burden. To the contrary, the Recall Statute is consistent with both the language and the history of the modern State Constitution. (p. 54)

The judgment of the Appellate Division is **AFFIRMED**.

**JUSTICE ALBIN**, **DISSENTING**, expresses the view that the plain meaning of the Judicial Article -- including its declaration that "justices and judges shall be retired upon attaining the age of 70 years" -- does not provide that justices and judges can be recalled to their offices beyond the age of seventy. Nor does it empower the Legislature to make laws to recall justices and judges beyond that age. In Justice Albin's view, if justices or judges are to serve in office beyond the age of seventy, full time or on recall, the Constitution must be amended.

**JUSTICES LaVECCHIA, FERNANDEZ-VINA, and SOLOMON, and JUDGE CUFF (temporarily assigned) join in CHIEF JUSTICE RABNER's opinion. JUSTICE ALBIN filed a separate, dissenting opinion. JUSTICE PATTERSON did not participate.**

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

       v.

JAMES BUCKNER,

    Defendant-Appellant.


       Argued April 28, 2015 – Decided July 30, 2015

       On appeal from the Superior Court, Appellate
       Division.

       Brian F. Plunkett, Assistant Deputy Public
       Defender, argued the cause for appellant
       (Joseph E. Krakora, Public Defender,
       attorney).

       Jeffrey P. Mongiello, Deputy Attorney
       General, argued the cause for respondent
       (John J. Hoffman, Acting Attorney General of
       New Jersey, attorney).

       Thomas H. Prol argued the cause for amicus
       curiae New Jersey State Bar Association
       (Paris P. Eliades, President, attorney; Mr.
       Eliades, of counsel; Mr. Eliades, Mr. Prol,
       Sandra T. Ayres, Robert B. Hille, and John
       W. Kaveney, on the brief).


    CHIEF JUSTICE RABNER delivered the opinion of the Court.

    For the past half century, the Judiciary has been able to

recall retired judges to serve temporarily in our State's court

system where they are needed most.  To recall judges who are

willing to serve, the Supreme Court has relied on statutes that authorize recall and date back to 1964. Since then, hundreds of retired judges have temporarily served on recall and resolved hundreds of thousands of cases. Their efforts have not only helped countless litigants on a timely basis but have also enhanced the quality of justice in our State.

Until now, recall service has gone unchallenged. Today, as the current Recall Statute -- N.J.S.A. 43:6A-13 -- turns forty, defendant claims that his criminal conviction should be reversed because it was unconstitutional for a retired judge to preside over his jury trial. He claims that the existing recall law -- passed by the Legislature, signed by the Governor, and relied on by the Judiciary for decades -- is unconstitutional. To make that novel argument, defendant relies on language in the State Constitution that says "judges shall be retired" when they turn seventy, and "[p]rovisions for the pensioning" of those judges "shall be made by law." N.J. Const. art. VI, § 6, ¶ 3.

Constitutions generally offer a framework for government but do not attempt to resolve all issues. See Reilly v. Ozzard, 33 N.J. 529, 539 (1960). What the Constitution does not bar, either expressly or by clear implication, is left to the Legislature to address. N.J. Sports & Exposition Auth. v. McCrane, 61 N.J. 1, 18, appeal dismissed, 409 U.S. 943, 93 S. Ct. 270, 34 L. Ed. 2d 215 (1972); Gangemi v. Berry, 25 N.J. 1,

2

11 (1957).  In that spirit, the modern State Constitution of 1947 provides for mandatory retirement of judges, but the document is silent on the subject of recall.  Nowhere does the plain language of the Constitution forbid recall.  And the mandatory retirement age in the Constitution, on which defendant relies, does not conflict with temporary recall assignments because the two concepts are distinct.  One prevents lifelong tenure; the other affords judges neither tenure nor a seven-year term and does not reverse a judge's retirement.

The history of the Constitutional Convention of 1947 reveals that the framers were very much aware of recall and neither required nor rejected it.  Among other options, they turned away from restrictive language in a prior draft Constitution which barred recall; they also declined to adopt a proposal at the other end of the spectrum which made recall mandatory.  The framers instead opted for a streamlined approach that selected a retirement age, required a pension system for judges, and otherwise left the details to the Legislature.  Nothing in the historical record suggests the framers wanted to ban recall.

At different times over the decades, the Legislature accepted the framers' invitation and included recall in the judicial pension statute.  That approach is consistent with the aims of the Constitutional Convention:  to develop an effective,

3

flexible, and fair system of justice.  The current system of recall serves those very goals.

The legislative enactments of the past fifty years are presumed constitutional.  Only if a law is "repugnan[t] to the constitution . . . beyond a reasonable doubt" can it be declared void.  Franklin v. N.J. Dep't of Human Servs., 111 N.J. 1, 17 (1988) (quotation omitted).

Defendant cannot, and has not, overcome the strong presumption of validity that underlies the Recall Statute.  The current recall law, in effect since 1975, violates neither the plain language of the State Constitution, as defendant claims, nor the separation of powers doctrine.  For that reason, we affirm the judgment of the Appellate Division, which upheld the Recall Statute.

I.

At the heart of this appeal are two provisions of law: part of the Judicial Article of the State Constitution, N.J. Const. art. VI, § 6, ¶ 3, and the Recall Statute, N.J.S.A. 43:6A-13(b).  We review them here to provide context for what follows.

The Judicial Article outlines the basic structure of the state court system and the powers of the Judiciary.  Section 6, Paragraph 3 of the Article discusses the appointment and

4

reappointment of judges, their retirement, and judicial pensions. That section provides in pertinent part that

> [t]he Justices of the Supreme Court and the Judges of the Superior Court shall hold their offices for initial terms of 7 years and upon reappointment shall hold their offices during good behavior . . . . Such justices and judges shall be retired upon attaining the age of 70 years. Provisions for the pensioning of the Justices of the Supreme Court and the Judges of the Superior Court shall be made by law.
>
> [N.J. Const. art. VI, § 6, ¶ 3.]

The provision thus requires that judges retire at age seventy. It also directs the Legislature to create a judicial pension system.

The Legislature responded on a number of occasions. In 1973, for example, Governor William T. Cahill signed into law the Judicial Retirement System Act ("JRSA"), N.J.S.A. 43:6A-1 to -46. All justices of the Supreme Court and judges of the Superior Court are members of the judicial retirement system, N.J.S.A. 43:6A-5, and, upon retirement, a judge is entitled to the payment of retirement benefits, N.J.S.A. 43:6A-16.

One section of the JRSA -- referred to as the Recall Statute -- allows retired judges to be recalled for temporary judicial service. See N.J.S.A. 43:6A-13. Under the law, judges can be recalled only if they have retired. The Recall Statute now provides, in part, that "[s]ubject to rules of the Supreme Court . . . any judge of the Superior Court . . . who has

5

retired on pension or retirement allowance may, with his

consent, be recalled by the Supreme Court for temporary service

within the judicial system other than the Supreme Court."

N.J.S.A. 43:6A-13(b).

The Recall Statute also details the conditions of recall

service:

> Upon such recall the retired . . . judge shall
> have all the powers of a . . . judge of the
> court to which he is assigned and shall be
> paid a per diem allowance fixed by the Supreme
> Court in accordance with its rules, provided
> however that in no event shall he receive a
> salary which together with his pension or
> retirement allowance exceeds the current
> salary of a . . . judge of the court from which
> he retired.
>
> [N.J.S.A. 43:6A-13(c).]

Recall judges do not receive a salary; they instead get a per

diem stipend that the Supreme Court has set at $300.

Administrative Directive 12-01, "Policy Governing Recall for

Temporary Service within the Judicial System" (July 19, 2001),

https://www.judiciary.state.nj.us/directive/personnel/dir_12_01.

pdf. They do not work full-time but must be able to "serve for

at least 120 days per year." Ibid. Recall judges receive

specific assignments within the court system -- often in areas

that "meet[] a significant need" or serve "a designated

statewide priority." Ibid. And they serve "at the pleasure of

the Supreme Court" for two-year terms that are renewable -- also

6

in the Court's discretion -- until the retired judge reaches age eighty.  Ibid.

The terms of recall service are thus defined by statute and Court directive.  This appeal asks whether temporary recall service violates the Judicial Article's mandatory retirement rule.

## II.

The constitutional question in this case arises out of the following events.  On the afternoon of March 21, 2010, defendant James Buckner attacked a woman as she returned to her car in the parking lot of the Morris County Mall in Cedar Knolls.  After she placed a package in the back seat and opened the front driver-side door, defendant grabbed her around the neck in a choke-hold, brought her to her knees, and told her to give him her purse.  Even though the victim told him to take the purse, he continued to choke her until she briefly passed out.  When defendant loosened his grip, the woman screamed and threw her keys.

Others in the parking lot heard the screams and responded. One passerby kicked defendant until he released the victim and began to walk away.  Another called the police and followed defendant to a store in the mall.  When the police arrived, the latter witness told an officer where defendant had gone.  Soon after, the officer detained defendant.  Minutes later, the

7

victim and both witnesses identified defendant as the attacker, while he sat in the back of a police car.

A grand jury in Morris County indicted defendant on six counts:  second-degree robbery, N.J.S.A. 2C:15-1(a)(1); third-degree hindering, N.J.S.A. 2C:29-3(b)(4); third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(7); third-degree attempted theft, N.J.S.A. 2C:20-3(a); first-degree robbery, N.J.S.A. 2C:15-1(a)(1); and second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1).

The Honorable Salem Vincent Ahto presided at defendant's trial.  Judge Ahto is a retired Superior Court Judge.  At the time of the trial, he was 73 years old.  This Court recalled him to service three times by orders dated June 24, 2008, June 29, 2010, and February 7, 2012.

Prior to trial, defendant moved to disqualify Judge Ahto for two reasons.  First, defendant alleged that Judge Ahto could not preside over the case because the Recall Statute -- the basis for his temporary assignment -- was unconstitutional.  For support, defense counsel relied on arguments presented in a different, recent case before the Judge.  Second, defendant asserted that Judge Ahto should not decide the disqualification motion because he had a financial interest in the case -- the $300 per diem.

Judge Ahto relied on his decision in the prior case and denied both motions. As to the first claim, he observed that he was "ill-equipped" to declare orders of the Supreme Court unconstitutional, that the Constitution does not bar recall service, and that the Recall Statute was presumptively valid. Judge Ahto relied on a memorandum from the Assignment Judge to deny the second argument. The memo noted that the per diem payment a recall judge receives is not the type of financial interest that requires disqualification.

After a three-day trial in April 2012, the jury found defendant guilty of second-degree robbery, third-degree aggravated assault, and attempted theft, and acquitted him of the remaining charges. Two months later, Judge Ahto sentenced defendant to nine years' imprisonment subject to the No Early Release Act, N.J.S.A. 2C:43-7.2.

Defendant appealed. He argued that the trial judge erred in denying the disqualification motions and claimed that his sentence was excessive. A divided appellate panel affirmed defendant's conviction. State v. Buckner, 437 N.J. Super. 8 (App. Div. 2014). The panel found that the trial judge properly declined to recuse himself based on a purported financial interest in the case. Id. at 37. The panel also upheld defendant's sentence. Id. at 37-38.

9

The panel divided over the constitutionality of the Recall Statute. Defendant claimed that it violated Article XI, Section IV, Paragraph 1 of the State Constitution (the "Schedule Article"), which states that "[n]o Justice of the new Supreme Court or Judge of the Superior Court shall hold his office after attaining the age of seventy years." N.J. Const. art. XI, § 4, ¶ 1. The majority explained that that language "applies exclusively to 'the incumbent judges who held their judicial offices at the adoption of the Constitution,' and therefore has no bearing here." Buckner, supra, 437 N.J. Super. at 25-26 (quoting Lloyd v. Vermeulen, 22 N.J. 200, 209 (1956)). The dissent agreed. Id. at 40 n.3 (Harris, J.A.D., dissenting). Both instead evaluated defendant's claim under the Judicial Article, which declares that "[t]he Justices of the Supreme Court and the Judges of the Superior Court . . . shall be retired upon attaining the age of 70 years." N.J. Const. art. VI, § 6, ¶ 3.

Judge Parrillo, writing for the majority, upheld the constitutionality of the statute. Buckner, supra, 437 N.J. Super. at 36. He began with an extensive review of the history of the Judicial Article and the Recall Statute. Id. at 13-23. Based on that analysis, the majority concluded that "the recall of judges over age seventy was a concept about which the members of the Convention were obviously aware" but "it was also one

10

which they chose not to consider, delegating that detail, instead, to the Legislature." Id. at 20.

In response, according to the majority, the Legislature enacted the JRSA, which authorized the Supreme Court to recall retired judges. Id. at 20-21, 32. Like all legislation, the majority noted, the Recall Statute "is presumed to be constitutional and will not be declared void unless it is clearly repugnant to the Constitution." Id. at 24 (quoting Trautmann ex rel. Trautmann v. Christie, 211 N.J. 300, 307 (2012)).

To assess the law's constitutionality, the majority searched the text of the Judicial Article and found "no language, express or even implied, banning the temporary recall of retired judges." Id. at 28. Unlike the proscriptive phrase in the Schedule Article -- "shall [not] hold office" -- the majority noted that the Judicial Article used the terms "shall be retired." Id. at 27-28. The majority found "nothing intrinsic in the definition of 'retire' to suggest its incompatibility with temporary recall service." Id. at 28.

As further support for its conclusion, the majority pointed to decisions by other state courts that found temporary post-retirement service constitutional, id. at 28-31; observed that the law achieved two overriding purposes of the Judicial Article, "to create flexibility in the court system and to

11

provide for prompt judicial relief," id. at 32; and noted that the statute had "been implemented without challenge or objection for almost four decades," id. at 33 (citing State v. Trump Hotels & Casino Resorts, 160 N.J. 505, 527 (1999)).

The majority also rejected an argument raised by the dissent, not the parties: that recall service is unconstitutional because it improperly encroaches upon the Executive's power of appointment and thus violates the separation of powers doctrine. Id. at 35. The majority found that the Recall Statute struck an appropriate compromise and maintained the balance among the three branches. Ibid.

Judge Harris, in dissent, concluded that the Recall Statute is unconstitutional. Id. at 39 (Harris, J.A.D., dissenting). He found that the retirement provision in the Judicial Article "was intended by its framers and the people who adopted it in 1947 to not permit the Legislature to authorize reinstatement of this state's judicial power to pensioner judges." Id. at 40 (Harris, J.A.D., dissenting). In the dissent's view, the phrase "shall be retired upon attaining the age of 70 years" in the Judicial Article "connotes (1) the compulsory abdication of a judicial office; (2) the surrender of judicial power"; and (3) "the permanent loss of the ability to exercise -- for the benefit of the public -- the sovereign functions of government that had previously been made possible by the Governor's

12

selection, with the advice and consent of the Senate." Id. at 42 (Harris, J.A.D., dissenting) (citation omitted). The dissent also stressed that "nothing in the Constitution authorizes" recall. Id. at 41 (Harris, J.A.D., dissenting).

The dissent found the language in the Schedule Article to be of little use because the term "office" "was clearly limited and intended to punctuate the end of incumbency under the 1844 constitutional framework for those pre-modern-era judges who had transitioned to the Superior Court." Id. at 43 (Harris, J.A.D., dissenting). The dissent also challenged the majority's reliance on decisions from other states because the constitutionality of New Jersey's recall platform cannot be measured from a "dissimilar foreign source." Id. at 47-48 (Harris, J.A.D., dissenting).

The dissent examined the history of the 1947 Constitutional Convention as well and concluded that the "excision" of the recall provision "that had appeared in the failed 1944 Constitution was purposive" -- "even though there is no express record of its rejection" at the 1947 Convention. Id. at 43-47 (Harris, J., dissenting). In the dissent's view, "the twenty-five-year span" from 1948 to 1973 "during which there was no recall legislation" also weighs against the majority's reading of the Constitution. Id. at 43-44 (Harris, J.A.D., dissenting). The dissent took "comfort in the recollection of Morris M.

13

Schnitzer," an advisor to the 1947 Convention.  Id. at 57

(Harris, J.A.D., dissenting).  In an interview nearly a half

century later, he recalled that it was "[c]ertainly not

[contemplated]" that judges could be recalled.  Ibid. (quoting

Conversations with Morris M. Schnitzer, 47 Rutgers L. Rev. 1391,

1401 (1995)).

Defendant appealed as of right under Rule 2:2-1(a)(2).  Our

review is thus limited to the issues raised by the dissent.

See, e.g., State v. T.J.M., 220 N.J. 220, 228 (2015).

The Court granted the New Jersey State Bar Association

(NJSBA) leave to appear as amicus curiae.

### III.

Defendant argues that the Recall Statute violates the plain

language of the Constitution.  Before this Court, he relies on

both the Schedule Article and the Judicial Article.  Defendant

asserts that, when read together, the two provisions "divest

judges of their judicial power at age 70 without exception."

The Recall Statute, according to defendant, directly conflicts

with those "clear constitutional provisions."

Defendant contends that the differences in language between

the Schedule Article and the Judicial Article do not support the

constitutionality of the Recall Statute.  He also submits that

the Constitution's silence on the subject of recall does not

weigh in favor of the law.  Because mandatory retirement is an

14

absolute bar to further service, defendant argues, there was no reason for the framers to explicitly bar recall. Defendant finds support for that proposition from the record of the 1947 Constitutional Convention and the period from 1948 to 1973, during which he claims the Legislature did not enact a recall provision.

Defendant also draws on the dissent in the Appellate Division and argues that the Recall Statute violates the separation of powers doctrine because it encroaches on the appointment power of the Executive Branch.

The State, represented by the Attorney General, maintains that the Recall Statute is constitutional. The State argues that the Constitution permits the Legislature to authorize temporary recall service. According to the State, a mandatory retirement age does not affirmatively bar recall. Absent direct evidence to the contrary, the State contends, the recall law -- which is presumed constitutional -- cannot be overturned.

The State asserts that defendant "confuses the concepts of retirement and temporary recall assignments, which are related but separately distinct and can co-exist without constitutional infirmity," and also "disregards the will of the people and the spirit of the New Jersey Constitution." In addition, the State argues that the Constitution's silence is not an affirmative ban on recall; that the framers deliberately chose not to use clear

15

language that would have precluded recall service; that the Constitution outlines broad principles of governance, not the details; and that the Recall Statute aids the Judiciary in its obligation to provide a fair, efficient, and functioning court system, consistent with the intent of the modern Constitution.

The State submits that defendant's separation of powers argument is not properly before the Court and is meritless, in any event. The State maintains that recall does not infringe on the Executive's authority to appoint judges and reflects a cooperative system of shared power among the branches of government.

The NJSBA does not take a position on the constitutionality of the Recall Statute. Instead, the NJSBA requests that if the Court declares the law unconstitutional, the ruling should be applied prospectively.

IV.

Defendant must shoulder a "heavy burden" to prevail on his claim that the Recall Statute is unconstitutional. Trump Hotels, supra, 160 N.J. at 526. He must hurdle "[t]he strong presumption of constitutionality that attaches" to this and every other law. Hamilton Amusement Ctr. v. Verniero, 156 N.J. 254, 285 (1998). Indeed, "from the time of Chief Justice Marshall," case law has steadfastly held to "the principle that

16

every possible presumption favors the validity of an act of the Legislature." McCrane, supra, 61 N.J. at 8.

The foundation for that presumption is solid and clear: the challenged law "represents the considered action of a body composed of popularly elected representatives," ibid., and, as Justice Oliver Wendell Holmes admonished, "it must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts," id. at 9 (quoting Mo., Kan. & Tex. Ry. Co. v. May, 194 U.S. 267, 270, 24 S. Ct. 638, 639, 48 L. Ed. 971, 973 (1904)). As a result, courts exercise the power to invalidate a statute on constitutional grounds with "extreme self restraint." Id. at 8.

To overcome the strong presumption of validity and "deference [due] to any legislative enactment," the challenger must demonstrate -- "unmistakably" -- that the law in question "run[s] afoul of the Constitution." Lewis v. Harris, 188 N.J. 415, 459 (2006) (citation omitted). This standard is also well-settled: "a legislative act will not be declared void unless its repugnancy to the constitution is clear beyond reasonable doubt." Gangemi, supra, 25 N.J. at 10 (emphasis added). When reasonable people "might differ" about the constitutionality of a law, courts must "defer[] to the will of the lawmakers." N.J. Ass'n on Corr. v. Lan, 80 N.J. 199, 220 (1979) (internal quotation marks and citation omitted).

17

Silence typically cannot satisfy a challenger's heavy burden of proof. "[W]hen the framers of the constitution intended that a subject should be placed beyond legislative control they said so." State v. De Lorenzo, 81 N.J.L. 613, 621 (E. & A. 1911); see also Humane Soc. of U.S., N.J. Branch, Inc. v. N.J. State Fish & Game Council, 70 N.J. 565, 579 (1976) (finding delegation of authority "is not in derogation of the constitution where that document is silent as to the" issue (citation omitted)). Viewed another way, "[t]he Legislature is invested with all powers not forbidden." Gangemi, supra, 25 N.J. at 11. Unless "prohibited by the Constitution expressly or by clear implication," "[t]he Legislature has the power to take any action or course reasonably necessary or incidental to the operation of government." McCrane, supra, 61 N.J. at 18.

To understand the meaning and intent of a constitutional provision, courts look first to the plain language the framers used. Comm. to Recall Robert Menendez v. Wells, 204 N.J. 79, 105 (2010). If the language is straightforward, "the words used must be given their plain meaning." Trump Hotels, supra, 160 N.J. at 527. If the language is unclear or open to more than one interpretation, courts may examine other sources for guidance, including the document's history and discussions at the constitutional convention. Menendez, supra, 204 N.J. at 106; Trump Hotels, supra, 160 N.J. at 527-28.

18

V.

New Jersey has had three constitutions. Neither the Constitution of 1776 nor the Constitution of 1844 contained a mandatory retirement provision for judges. Buckner, supra, 437 N.J. Super. at 13. Our focus is on the modern State Constitution, which was ratified by the voters in 1947 and took effect in 1948.

A.

Defendant relied exclusively on Article XI of the Constitution, the Schedule Article, before the trial court and the Appellate Division. Article XI "contains various phase-in provisions designed to facilitate the smooth transition to the 1947 constitution and several subsequent amendments." Robert F. Williams, The New Jersey State Constitution 197 (2d ed. 2012). As the majority and the dissent in the Appellate Division correctly noted, the Schedule Article has no bearing here because the provisions in Article XI, Section 4, Paragraph 1 "dealt exclusively with the incumbent judges who held their judicial offices at the adoption of the Constitution." Lloyd, supra, 22 N.J. at 209; see also Buckner, supra, 437 N.J. Super. at 25-26.

The Schedule Article directs the Governor to appoint the members of the new Supreme Court from among certain judges of the outgoing court system. N.J. Const. art. XI, § 4, ¶ 1. The

19

provision also identifies which judicial officers would become judges of the new Superior Court.  Ibid.  Finally, the paragraph provides that

> [t]he Justices of the new Supreme Court and the Judges of the Superior Court so designated shall hold office each for the period of his term which remains unexpired at the time the Constitution is adopted; and if reappointed he shall hold office during good behavior.  No Justice of the new Supreme Court or Judge of the Superior Court shall hold his office after attaining the age of seventy years, except, however, that such Justice or Judge may complete the period of his term which remains unexpired at the time the Constitution is adopted.
>
> [Ibid. (emphasis added).]

As with the rest of Paragraph 1, "the framers adequately displayed that they were dealing with the incumbent judges who held judicial offices at the adoption of the Constitution." Lloyd, supra, 22 N.J. at 210.  Defendant's reliance on the Schedule Article is therefore misplaced.

B.

The proper focus of this case is the Judicial Article of the modern Constitution -- Article VI, Section 6, Paragraph 3. For ease of reference, we quote part of it again:

> The Justices of the Supreme Court and the Judges of the Superior Court shall hold their offices for initial terms of 7 years and upon reappointment shall hold their offices during good behavior . . . .  Such justices and judges shall be retired upon attaining the age of 70 years.  Provisions for the pensioning of the

20

> Justices of the Supreme Court and the Judges
> of the Superior Court shall be made by law.

> [N.J. Const. art. VI, § 6, ¶ 3.]

The paragraph does not mention recall.  It does not explicitly bar recall.  Nor does it say that all service of any type must end at age seventy.  As discussed earlier, the Constitution's silence does not help defendant; unless the Constitution "expressly or by clear implication" forbids the political branches from acting, they have the authority to proceed. McCrane, supra, 61 N.J. at 18.  That begs the question:  is the phrase "shall be retired" in the Judicial Article unmistakably incompatible with temporary recall service?  Does the language clearly imply, beyond a reasonable doubt, that the Constitution bars recall service?

The word "retired," by itself, is not incompatible with recall service.  In the context of Paragraph 3, "retire" means an end to a seven-year or tenured term of service, and the start of "pensioning."  It marks a withdrawal from the office of Superior Court Judge and paves the way for a successor to fill that position.

At the time of the Constitutional Convention, "retired" meant just that.  Webster's defined "to retire" as "[t]o withdraw from a public station, or from business; as, having made a large fortune, he retired."  Webster's Revised Unabridged

21

Dictionary 1231 (1913), http://machaut.uchicago.edu/websters; see also 2 Webster's New International Dictionary 2128 (2d ed. 1949) (same).  Retirement, thus, meant an end to lifelong tenure, which the federal system permitted.  U.S. Const. art. III, § 1.  The 1844 Constitution, as well, had no age limit for judicial service.  See N.J. Const. of 1844 art. VI, § 2; art. VII, § 2.

Temporary recall service, by comparison, does not reverse a judge's retirement.  It does not restore judges to their former position.  It does not invest them with a seven-year or tenured term.  Unlike a judge appointed under the Judicial Article, recall judges serve for two years at the pleasure of the Supreme Court.  Administrative Directive 12-01, supra.  Rather than sign orders as a "Judge of the Superior Court," they note that they are "retired and temporarily on recall."  They do not earn a judicial salary; recall judges instead receive $300 per diem and can earn no more than one-quarter of a judicial salary in a year.  See id.; N.J.S.A. 43:6A-8(e).  Also, the duties of recall judges are often limited to participation in "special projects and programs, so that judges on permanent assignment are not diverted from their primary responsibilities."  Administrative Directive 12-01, supra.

The law has recognized the significance of those basic differences for well more than a century.  See, e.g., United

States v. Hartwell, 73 U.S. (6 Wall.) 385, 393, 18 L. Ed. 830, 832 (1868) (noting that concept of office holder "embraces the ideas of tenure, duration, emolument, and duties"). Those differences also help demonstrate that temporary recall service and service as a Judge of the Superior Court are distinct forms of service that can co-exist. In short, recall judges remain retired.

The Appellate Division dissent submits that recall clashes with retirement because "shall be retired" "connotes" the complete "surrender of judicial power" and "the permanent loss of the ability to exercise" the functions of a judge. Buckner, supra, 437 N.J. Super. at 42 (Harris, J.A.D., dissenting). If that were true, retired judges could not provide temporary recall service. By the same logic, no retired judge could be recalled to swear in a public official, which routinely happens. See N.J.S.A. 41:2-1; N.J.S.A. 41:2-10.

But the dissent's far-reaching connotation finds no support in the text of the Constitution, which simply says that judges "shall be retired" and subject to "pensioning." The Judicial Article does not foreclose recall on a limited or temporary basis -- either expressly or by clear implication.

The parties and the Appellate Division opinions also discuss the framers' choice to use different language in the Schedule and Judicial Articles. The Schedule Article provides

23

that "[n]o Justice of the new Supreme Court or Judge of the Superior Court shall hold his office after attaining the age of seventy years, except, however, that such Justice or Judge may complete the period of his term which remains unexpired at the time the Constitution is adopted." N.J. Const. art. XI, § 4, ¶ 1.

As noted earlier, the Schedule Article was meant "to provide for the transition" from the old to the new Constitution. 2 Proceedings of the Constitutional Convention of 1947, 1195. The framers intended that the Article would "govern incumbent judges until the expiration of their terms . . . and make[] such other specific provisions as are necessary until the new Judicial Article is completely in effect." Ibid. The language in the Schedule Article thus addressed a unique concern about offices soon to be eliminated.

The difference in language reveals that the framers knew how to bar recall but chose not to do so in the Judicial Article. The first phrase of the Schedule Article -- no judge "shall hold his office after attaining the age of seventy years" -- banned recall. To undo its effect, the framers had to create an escape clause and expressly permit judges to complete their unexpired terms. The Judicial Article, once again, does not bar recall; it says that judges "shall be retired" at age seventy and subject to a pension. Had the framers intended to ban

24

recall, they could have repeated the text they used in the Schedule Article.  Their deliberate use of different language is telling.  See GE Solid State v. Dir., Div. of Taxation, 132 N.J. 298, 308 (1993) (citation omitted); Norman J. Singer & Shambie Singer, 2A Sutherland Statutory Construction § 46:6, at 261-66 (7th ed. 2014).

                                C.

Because the language of the Constitution does not rule out recall, there is no need to turn to extrinsic sources.  Trump Hotels, supra, 160 N.J. at 527.  A close look at the constitutional proceedings, however, does not suggest that the framers wanted to restrict recall.  Rather, the history of the Judicial Article shows that the framers considered various options and declined to act on any of them, opting instead to leave the issue to the Legislature.

"The movement that culminated in the adoption of New Jersey's 'model' constitution of 1947 actually began in earnest in 1940.  From that date until 1947, a succession of three governors made constitutional reform a high priority in their administrations."  Williams, supra, at 22.

In 1941, the Legislature appointed a commission to study constitutional reform.  L. 1941, Joint Resolution No. 2 (Nov. 18, 1941).  The following year, the Commission chaired by Senator Robert Hendrickson submitted a draft constitution.

25

Among other significant changes, the 1942 draft included extensive reform to the New Jersey court system.  Proposed Const. (1942), reprinted in 4 Proceedings, supra, at 556-65. The draft provided in part that

> [t]he Chief Justice and associate justices of the Supreme Court shall be appointed to hold office during good behavior.  Justices of the Superior Court shall hold office for a term of seven years and if reappointed shall thereafter hold office during good behavior. . . . No justice or judge of any court shall continue in office after he has attained the age of seventy years.
>
> [Proposed Revised Const. (1942) art. V, § 5, ¶ 3, reprinted in 4 Proceedings, supra, at 562 (emphasis added).]

The Legislature held hearings on the draft but did not submit it to the voters, many of whom were away to fight in World War II. Williams, supra, at 24.  Certain legislators pressed forward in the next session, and the voters ultimately authorized "the 1944 legislature to act as a limited constitutional convention." Ibid.

A joint legislative committee worked off of the 1942 draft to create the Proposed Constitution of 1944.  Id. at 25.  The 1944 draft provided that

> [n]o Justice of the Supreme Court or of the Superior Court shall continue in office after he has attained the age of seventy years. Subject to law, the Chief Justice may assign any such judicial officer who has attained the age of seventy years to temporary service in

> the Supreme Court or in the Superior Court, as need appears.
>
> [Proposed Revised Const. (1944) art. V., § 5, ¶ 5 (emphasis added).]

The 1944 draft thus barred judges from "continu[ing] in office" after age seventy and added a recall provision.

The voters rejected the proposed constitution in November 1944 "amid heated partisan and other political controversy." Williams, supra, at 25. As defendant concedes, however, there is no sign from the historical sources that the voters reacted to the recall language in particular. See also Buckner, supra, 437 N.J. Super. at 16.

The movement to reform the Constitution advanced in the next few years. In June 1947, the voters overwhelmingly approved a constitutional convention and elected delegates to attend. Williams, supra, at 26. The delegates met that summer and produced what Professor Robert F. Williams, a recognized scholar in the field, says "has been viewed as among the best of the state constitutions." Ibid.

A comprehensive record -- that fills five volumes -- exists of the presentations and discussions at the 1947 Constitutional Convention. The Committee on the Judiciary heard from dozens of people at ten open meetings; it also met multiple times in executive session to consider testimony and formulate a draft of the Judicial Article. 4 Proceedings, supra, at iii. Testimony

27

at the open meetings and public hearing appears in the historical record; no record was made of closed executive sessions to foster discussion.  Id. at iii-iv.

On July 24, 1947, the Committee on the Judiciary presented a "Tentative Draft of [the] Judicial Article" to the Convention and invited public comments.  2 Proceedings, supra, at 1166. The final draft submitted to the voters -- with only slight changes to the relevant provision -- provided in part as follows:

> The Justices of the Supreme Court and the Judges of the Superior Court shall hold their offices for initial terms of seven years and upon reappointment shall hold their offices during good behavior.  Such Justices and Judges shall be retired upon attaining the age of seventy years.  Provisions for the pensioning of the Justices of the Supreme Court and the Judges of the Superior Court shall be made by law.
>
> [Final Draft of the Const., art. VI, § 6, ¶ 3, reprinted in 2 Proceedings, supra, at 1303.]

The Committee thus made three noteworthy changes from the Proposed Constitution of 1944:  (1) it replaced the phrase "[n]o Justice of the Supreme Court or of the Superior Court shall continue in office after he has attained the age of seventy years" with "[s]uch Justices and Judges shall be retired upon attaining the age of seventy years"; (2) it removed the recall provision; and (3) it added the "pensioning" provision.

28

The first change is critical.  Standing alone, the declaration in the 1944 draft -- "No Justice . . . shall continue in office" after age seventy -- would have barred temporary recall service.  The quoted language would not have permitted recall judges to continue to wield the authority of their prior office in any form of service.  The 1942 draft, which had only that language, therefore, would have barred recall.

To counter the meaning of the quoted phrase, the drafters had to provide for recall explicitly in the 1944 draft.  They did so by adding that judges who had reached seventy could be recalled to temporary service "[s]ubject to law."  Proposed Revised Const. (1944) art. V., § 5, ¶ 5.

The 1947 Constitution, by contrast, took a different approach.  It did not affirmatively bar judges from "continu[ing] in office"; it instead stated that judges "shall be retired" and pensioned at age seventy.  Because the revised language removed the bar to recall service, it was no longer necessary to permit recall expressly.

The shift in language also marked a decision to leave the question of recall to the Legislature.  By comparison, the 1944 proposed Constitution would itself have allowed the Chief Justice to recall retired judges.  Because powers that are not prohibited are vested in the Legislature, see Gangemi, supra, 25

29

N.J. at 11, the 1947 Constitution gave the Legislative Branch the authority to decide whether, when, and how to allow for recall. That implicit delegation of power is reinforced by the paragraph's last sentence, which directs the Legislature to provide for "the pensioning" of judges. N.J. Const. art. VI, § 6, ¶ 3.

The framers settled on the final draft after they considered and rejected alternate proposals -- including some that directly addressed recall. Evelyn Seufert and John Bebout, for example, presented a draft judicial article on June 24, 1947, on behalf of the New Jersey Committee for Constitutional Revision. 4 Proceedings, supra, at 26-30; see also id. at 575-83 (explanation of draft). Section 5, Paragraph 5 of the draft provided that

> [n]o justice or judge shall remain in continuous service after he has attained the age of seventy years; but the chief justice may assign any such judicial officer who has attained the age of 70 years before his term has expired to temporary service in the supreme court or in the general court, as need appears.
>
> [Id. at 28 (emphasis added).]

As in the 1944 draft, the introductory phrase of the proposal -- "No justice or judge shall remain in continuous service" -- would have barred recall. To alter the effect of that language, the draft had to provide expressly for recall service for

30

retired judges over age seventy.  The proposal also removed the Legislature from the equation.  Because the framers of the 1947 draft did not adopt the first part of the proposal, they did not need to add language to authorize recall.

The framers likewise declined to adopt an amendment that Chief Justice Thomas J. Brogan proposed:

> Such Justices or Judges shall be eligible for retirement at the age of seventy years, but shall be retired at the age of seventy-five years.  Upon the retirement of any such Justice or Judge he shall receive a pension equal in amount to the salary which he is receiving at that time.  Such Justice or Judge shall be required, if able so to do, to perform such judicial duties and services as may be required of him by designation or order of the Court of Appeals . . . .
>
> [2 Proceedings, supra, at 1207 (emphasis added).]

That proposal, of course, would have changed the Judicial Article in a number of ways and made recall service mandatory.

The League of Women Voters offered a different variation for the Judicial Article, which was also not adopted.  Their recommendation mirrored part of the 1942 draft and would have barred recall.  See 4 Proceedings, supra, at 60, 596 (recommending that "[n]o justice shall continue in office after he has attained the age of seventy years").

At various times during the Convention, other individuals offered positive comments about recall.  For example, Justice

Nathan L. Jacobs, then the Vice-Chairman of the Committee on the Judiciary, observed that "even if you do have a so-called compulsory retirement age, you may make adequate provision for allowing the court to use these retired judges to the extent of their capacities." 4 Proceedings, supra, at 169. At a later session, Justice Frederic R. Colie addressed the question of judicial "overwork" as follows:

> I think that judges who are retired, either voluntarily or because they have reached the age limit, should be kept on the roll, the roll of the judiciary, so that they can do as they do in Connecticut. There they are sort of referees, or masters, and may be called in by the Chief Justice when the occasion arises, to handle cases.
>
> [Id. at 214.]

See also id. at 543 ("[A]fter [age] 75, retire [the judges]. And then put them on the inactive list subject to the call of the Chief Justice . . . at all times." (Judge Robert Carey)).

Whatever the merits of the various comments and proposals, they reveal certain important points: the issue of recall was squarely before the framers at the Convention, yet they did not address the question in the text of the Constitution they crafted. The framers, though, did not have to adopt a particular approach to keep the possibility of recall alive. By taking the course they chose -- neither embracing nor rejecting recall expressly or by clear implication -- the framers

32

effectively left the issue to the Legislature. Gangemi, supra, 25 N.J. at 11.

To repeat, the historical record reveals that the framers were well aware of recall when they drafted the Judicial Article. They had multiple examples to consider: the 1942 draft against recall; the 1944 draft in favor; and the varied proposals and comments raised at the Convention. Yet not a single delegate or witness spoke out against temporary recall service. Defendant maintains that the framers expressly barred recall -- even though the Constitution does not say so, and nothing in the record of the proceedings suggests the framers had that in mind. The dissent in the Appellate Division believes that the framers purposely omitted a recall provision, Buckner, supra, 437 N.J. Super. at 46-47 (Harris, J.A.D., dissenting), but, again, nothing in the record supports that view. The framers instead left it to the Legislature to decide what, if anything, to do about recall.

By comparison, in Menendez, supra, this Court addressed an attempt by a committee of voters who sought a recall election of a sitting United States Senator. 204 N.J. at 85. The question called for an examination of the text of the Federal Constitution and relevant historical materials. Ibid. Although the Federal Constitution does not directly address recall, id. at 105-06, this Court observed that the right to recall elected

33

representatives from office was expressly "considered and rejected" at the Federal Constitutional Convention in 1787, id. at 107. The delegates, in fact, unanimously voted to strike proposed language that would have allowed recall. Ibid. Many delegates to the Convention and the state ratifying conventions also "highlighted that recall was not part of the proposed new Constitution. Some did so approvingly; others lamented that recall did not exist." Id. at 86. Relying in part on that history, this Court concluded that the Federal Constitution "do[es] not allow the states the power to recall U.S. Senators." Ibid.

No delegates to the 1947 State Constitutional Convention voted down judicial recall service, and none declared that it was not part of the new State Constitution.[1] Viewed in isolation or in context, the Constitution's silence is not a rejection of

---

[1] The dissent relies on an additional source: an interview that Morris M. Schnitzer gave nearly forty years after the Constitutional Convention. See post at ___ (slip op. at 12). Schnitzer was not among the framers of the 1947 Constitution but was an esteemed member of the bar who testified at the Convention. He also described his role at the Convention as a co-technical advisor to the Judiciary Committee. Conversations, supra, 47 Rutgers L. Rev. at 1392. Schnitzer believed that the framers did not intend to permit recall. Id. at 1401.

No authority, however, suggests that a court can reconstruct the meaning of a constitutional text by asking an advisor what the framers meant decades after the fact. What matters, of course, is the language of the Constitution itself and the contemporaneous debates at the Convention.

34

recall.  It amounts to an appropriate delegation of authority to another branch of government.

D.

The emphasis at the Convention on both simplicity of language and the need for flexibility in the court system also supports the above analysis.  Those and other themes repeatedly surfaced during the debates, and they shed light on the changes from the 1944 to the 1947 draft Constitutions.

The notion of simplicity animated the 1947 Convention from the start.  Governor Alfred E. Driscoll opened the Convention and charged the delegates to "limit[] our State Constitution to a statement of basic fundamental principles."  1 Proceedings, supra, at 7.  He pointed to "the ageless virtue of simplicity" of the Federal Constitution.  Ibid.  The Governor also stressed that the State Constitution is a "basis for government" and "should not be a series of legislative enactments."  Ibid.

Others highlighted the same concerns at meetings of the Committee on the Judiciary.  Harvard Law School Dean Roscoe Pound cautioned that

> [i]f there is anything that needs to be borne in mind in the Constitution it is not to put in too much.  Robert Louis Stevenson said, the difference between Homer and the ordinary poet was that Homer knew what to leave out.  The difference between the man who writes a good constitution and one who doesn't is that the former knows what to leave out.  Amending a constitution is a slow business, and the way

35

> to achieve a thing that has to be achieved is on the basis of experience by those who have the experience. Don't, therefore, lay down a hard and fast elaborate scheme of courts, their boundaries rigidly defined, and their personnel rigidly defined.
>
> [4 Proceedings, supra, at 113.]

Chief Justice Clarence E. Case similarly testified that "[t]here were a number of things in [the] proposed Constitution of 1944 that I think should not be in a Constitution, not because they are not good, wise and advisable, but because adequate discretion is not left to the court in some instances and to the Legislature in some instances." Id. at 134.

The preference for broad-strokes draftsmanship with details left to the Legislature, or to the Court's rulemaking authority, echoed throughout the Convention. See W. Brooke Graves, What Should a Constitution Contain?, in 2 Proceedings, supra, at 1329-35; 4 Proceedings, supra, at 19, 34-35, 52-55, 113-14, 180, 189, 211, 264-65, 328, 429-31, 537.

The Committee on the Judiciary embraced the goal to keep the Constitution simple. In its August 26, 1947 report to the Convention, which accompanied the proposed draft Judicial Article, the Committee stressed that "Constitutions should deal with fundamentals, not details." 2 Proceedings, supra, at 1181.

The Judicial Article, like the Constitution, provides a framework but does not address all issues. See id. at 1180; see

36

also <u>Reilly</u>, <u>supra</u>, 33 <u>N.J.</u> at 539-40.  It does include certain mandates, but it omits discretionary details.  For example, the Chief Justice "<u>shall</u> appoint an Administrative Director to serve at his pleasure," <u>N.J. Const.</u> art. VI, § 7, ¶ 1 (emphasis added), and "<u>shall</u> assign Judges of the Superior Court," <u>N.J. Const.</u> art. VI, § 7, ¶ 2 (emphasis added), whom he "may" transfer, <u>ibid.</u>  Similarly, "[t]he Clerk of the Supreme Court and the Clerk of the Superior Court <u>shall</u> be appointed by the Supreme Court."  <u>N.J. Const.</u> art. VI, § 7, ¶ 3 (emphasis added).  By contrast, discretionary details -- about recall and a host of other matters -- were left out of the streamlined document.

In addition to simplicity of language, the Committee on the Judiciary focused on "three fundamental requirements" of a modern judicial system:  "[u]nification of courts"; "[f]lexibility of the court system"; and "[c]ontrol over administration, practice and procedure by rules of court."  2 <u>Proceedings</u>, <u>supra</u>, at 1180.  Those "basic principles . . . guided the Committee in framing the Judicial Article."  <u>Ibid.</u>

Those core principles reflected the desire for a new court system that is fair, efficient, simple, and strong.  As Chief Justice Vanderbilt observed,

> [t]here can be no doubt in the mind of anyone familiar with the work of the Constitutional Convention or with the ensuing election at which the Constitution was adopted by the people that . . . there was a clear intent to

37

> establish a simple but fully integrated system
> of courts and to give to the judiciary the
> power and thus to impose on them the
> responsibility for seeing that the judicial
> system functioned effectively in the public
> interest. Indeed, in the minds of many, if
> not a majority, of our citizens this was the
> primary reason for their desire for a new
> constitution.
>
> [Winberry v. Salisbury, 5 N.J. 240, 244
> (1950).]

Without question, the framers' goals responded to the much-maligned prior court system, which was described in 1943 as follows:

> [I]f you want to see the old common law in all
> its picturesque formality, with its fictions
> and fads, its delays and uncertainties, the
> place to look for them is not London, . . .
> but in New Jersey. Dickens, or any other law
> reformer of a century ago, would feel more at
> home in Trenton than in London.
>
> [Carla Vivian Bello & Arthur T. Vanderbilt,
> New Jersey's Judicial Revolution: A
> Political Miracle 3 (1997) (quoting D. W.
> Brogan, The English People (1943)).]

A series of additional, related concerns about mandatory retirement -- voiced repeatedly at the Convention -- is also noteworthy. The first addressed a serious and delicate subject: that incapacitated judges not remain indefinitely on the bench. See, e.g., 4 Proceedings, supra, at 167 ("The difficulty with 'optional [retirement],' as I see it, is that the men who are really in a position where they should be retired are the last ones to accept that option, because those men are the last to

38

acknowledge that they have reached the point where, perhaps, they are letting go a little bit." (Amos F. Dixon)); id. at 135 ("The lack of an age limit sometimes works to the disadvantage of the court." (Chief Justice Clarence E. Case, recommending compulsory retirement at age seventy-five)); id. at 426 (noting that an age limit could prevent judges from remaining on the bench "after they have gotten to their dotage" (Judge Learned Hand)).

Second, some commentators suggested that mandatory retirement could attract new judges to the bench. See, e.g., id. at 36-37 ("[L]ife tenure . . . may promote stagnation on the bench." (Evelyn Seufert, recommending automatic retirement at age seventy)); id. at 170 ("[I]f we retired the judges at a reasonable age, . . . we would not have the situation where they . . . [are] blocking the progress of a lot of very able men who could step into those positions if they stepped out." (Amos F. Dixon)).

Third, others lamented that a fixed age when judges must quit the bench could deprive the court system of gifted and experienced judges still in their prime. See, e.g., id. at 484 ("[W]e have many, many judges throughout the State and the country who are well above 70, who are alert, able and have over a long period of years acquired a tremendous wealth of legal thinking, wisdom and judgment." (Judge Thomas Madden)); id. at

515-16 ("[S]ome of our most renowned jurists in the State of New Jersey reached their greatest stature after the age of 70." (Morgan R. Seiffert, on behalf of the Law Reform Committee of the New Jersey Bar Association)); id. at 542-43 (citing numerous examples of judges who performed ably after reaching age seventy, including Justice "Oliver Wendell Holmes [who] was over 90 years of age when he signed his last opinion as a United States Supreme Court Justice" (Judge Robert Carey)).

Temporary recall service is consistent with both the fundamental principles underlying the Judicial Article and concerns about retirement raised at the Convention. Recall enhances the efficiency of the new, unified court system through resort to additional, temporary judicial resources, as needed. Judges are retired from the bench at age seventy, yet the Judiciary can benefit from experienced and able retired jurists on recall. Meanwhile, the service of recall judges in no way prevents attracting new judges to the bench because the office of Superior Court Judge becomes vacant upon a judge's retirement.

We turn to the history and purpose of the Recall Statute to explore those and other points more fully.

VI.

Governor Driscoll encouraged the members of the Committee on the Judiciary to provide for a retirement age but not

40

incorporate "[t]he particular details with respect to retirement . . . in the Constitution."  4 Proceedings, supra, at 429.  The Committee followed his advice.  The framers set the mandatory retirement age at seventy and otherwise simply stated that "[p]rovisions for the pensioning of the Justices of the Supreme Court and the Judges of the Superior Court shall be made by law."  N.J. Const. art. VI, § 6, ¶ 3.  In response, the Legislature designed a pensioning system that today includes recall.

In 1948, the Legislature enacted a judicial pension system that did not provide for recall.  L. 1948, c. 391.  The Legislature amended the statute in 1964 to permit the Chief Justice to assign retired judges to the Superior Court:  "Any person who retires under the provisions of this act may be designated and assigned by the chief justice of the supreme court to perform such duties as he shall be willing to undertake."  L. 1964, c. 138 (codified at N.J.S.A. 43:6-6.16 (1964)).  The law imposed no age restriction on recall and ruled out compensation for recall service.  Ibid.

The Legislature repealed the provision in 1968 and replaced it with the following:

> Any judge retired on pension, except a judge
> of the municipal court, who has not attained
> the age of 70 years, may, with his consent, be
> assigned by the chief justice to sit in any
> court but the supreme court, or in the case of

41

> a retired justice of the supreme court, to sit in any court.
>
> Upon such assignment the retired judge shall have all the powers of a judge or justice of the court to which he is assigned and shall be paid a per diem allowance to be fixed by the chief justice at a rate which, for a court year, together with his pension, shall not exceed the current salary of the court from which he retired.
>
> [L. 1968, c. 232 (codified at N.J.S.A. 43:6-6.39 to -.40 (1968)).]

Thus, as envisioned by the Constitution, the Legislature exercised its authority to modify the judicial pension statute -- here, by limiting the maximum age for judges on recall and offering compensation.

In 1973, Governor Cahill signed the JRSA into law and created a new Judicial Retirement System. L. 1973, c. 140 (codified at N.J.S.A. 43:6A-1 to -46). The new statute kept in place the recall provision enacted five years earlier. L. 1973, c. 140, § 13 (codified at N.J.S.A. 43:6A-13).

Calls for additional reform followed soon after. The New Jersey Law Journal featured two editorials that encouraged the recall of judges over the age of seventy and opined that such an approach would be constitutional. Judicial Service for Judges Retired at Age 70 Who Wish Such Service, 97 N.J.L.J. 188 (Mar. 21, 1974); Senior Judges, 97 N.J.L.J. 68 (Jan. 31, 1974).

42

The second editorial brought attention to an opinion of the Supreme Judicial Court of Massachusetts, Opinion of Justices, 284 N.E.2d 908 (Mass. 1972). In that decision, the Massachusetts court responded to questions posed by the State Senate; the Senate had asked whether a proposed bill to allow temporary recall service by certain retired judges would violate a proposed amendment to the Massachusetts Constitution. The key language of the amendment was similar to the wording of New Jersey's Judicial Article: "upon attaining seventy years of age said judges shall be retired." Id. at 910 (emphasis added). In an advisory opinion, the Massachusetts court found "no conflict between the precise language of the amendment and the bill." Id. at 912. The court explained that the meaning of the phrase "shall be retired" "was not intended to rule out the possibility of recall for temporary or restricted service." Ibid.

The Bar Institute and Law Center of New Jersey also weighed in on the issue of recall in October 1974, in response to a request of the Supreme Court. See The Bar Institute and Law Center of New Jersey, Recall of Judges Past the Age of Mandatory Retirement: An Examination of the Pertinent Issues (Oct. 1974). The group recommended "a recall provision for retired judges" so that they could "return to the bench according to the needs of our court system and according to their abilities to render such service." Id. at 14.

43

The Legislature took action in 1975 and amended the Recall Statute. L. 1975, c. 14. The amendment removed the law's age restriction and permitted the recall of retired judges older than seventy. Ibid. According to the Sponsor's Statement,

> [t]he New Jersey Constitution in Article VI, Section VI, paragraph 3 requires that judges retire at age 70. This mandatory retirement does not however prevent the utilization of such senior judges on a special assignment basis, if they so desire, at the pleasure of the Chief Justice.
>
> Permitting the assignment of senior judges would help speed the administration of justice and, by securing the benefit of years of judicial experience, increase the quality of justice.
>
> [Assemb. 1419 (Sponsor's Statement), 196th Leg. (N.J. Apr. 1, 1974).]

The 1975 amendment is codified at N.J.S.A. 43:6A-13(b). The Recall Statute, which has since been amended twice in ways that are not relevant to this appeal, now provides in part:

> b. Subject to rules of the Supreme Court, any justice of the Supreme Court who has retired on pension or retirement allowance may, with his consent, be recalled by the Supreme Court for temporary service in the Supreme Court[2] or elsewhere within the judicial system, and any judge of the Superior Court, juvenile and domestic relations court, county district court or tax court who has retired on pension or retirement allowance may, with his consent, be recalled by the Supreme Court for temporary service within the judicial system other than the Supreme Court.

---

[2] We do not address recall to the Supreme Court because that part of the statute is not raised by this appeal.

44

c. Upon such recall the retired justice or judge shall have all the powers of a justice or judge of the court to which he is assigned and shall be paid a per diem allowance fixed by the Supreme Court in accordance with its rules, provided however that in no event shall he receive a salary which together with his pension or retirement allowance exceeds the current salary of a justice or judge of the court from which he retired.  In addition the recalled justice or judge shall be reimbursed for reasonable expenses actually incurred by him in connection with his assignment and shall be provided with such facilities as may be required in the performance of his duties.  Such per diem compensation and expenses shall be paid by the State.

d. Payment for services and expenses shall be made in the same manner as payment is made to the justices or judges of the court from which he retired.

e.  The Supreme Court is empowered to adopt such rules as it deems necessary or appropriate for the prompt and efficient administration of justice in furtherance of the purposes of this act.

[N.J.S.A. 43:6A-13(b) – (e).]

Pursuant to subsection (e), the Court, through the Director of the Administrative Office of the Courts (AOC), issued a policy on recall in 2001.  See Administrative Directive 12-01, supra.  The Directive establishes terms and conditions of recall service, some of which are summarized above.  Recall judges serve for renewable two-year terms, at the pleasure of the Supreme Court; cannot practice law or be associated with a law firm while on recall; must undergo a full medical examination by

45

an independent doctor as a prerequisite to any recall order; may not be recalled after age eighty; are bound by the ethical restrictions applicable to all judges; and, receive $300 per diem.  Ibid.  Priority is given to retired judges who are willing to accept assignments that meet "a significant need" in the court system.  Ibid.  The Directive also aptly notes that,

> [o]ver the years, the Judiciary has benefitted greatly from the willingness of retired judges to be recalled for judicial service.  Recall judges provide stability and continuity for the work of the Judiciary by accepting assignments for special projects and programs, so that judges on permanent assignment are not diverted from their primary responsibilities.
>
> [Ibid.]

Today, more than seventy judges provide invaluable help as they serve on temporary recall assignments throughout the State Judiciary.  According to estimates by the AOC, they have presided over hundreds of thousands of cases over the years, large and small -- each of which involved parties seeking justice from the courts.  Recall judges serve for modest pay, and many continue to work without any payment after they reach the maximum number of days for which they can be compensated.  They do so to help provide prompt justice to the people of our State.

Those realities, of course, cannot drive this Court's decision.  If the Constitution prohibited recall, that would end

46

the discussion, no matter how great the benefits of any recall system. But the Constitution does not forbid recall. It is silent. It leaves the issue of recall to legislators whose response -- the Recall Statute -- dovetails with the overarching concerns of the Constitutional Convention: to help transform an inefficient court system that had been the subject of widespread criticism into a more effective system of justice.

As discussed earlier, the Recall Statute, like all legislative enactments, is entitled to a strong presumption of validity. In an effort to overcome that presumption, defendant suggests that the twenty-five-year period from 1948 to 1973, when he claims there was no recall legislation, is proof that the framers did not intend recall.

The argument's premise is flawed. The Legislature first enacted a recall provision in 1964 and modified it in 1968. The Recall Statute of 1973 essentially adopted the 1968 law. Even more important, the argument turns the accepted analysis on its head. The recall law is presumptively valid, and defendant, who challenges it, must show "unmistakably" that the law "run[s] afoul of the Constitution." Lewis, supra, 188 N.J. at 459 (citation omitted). Defendant's suspicion, based on a period of legislative inaction, is not enough to hurdle the high threshold he faces.

47

If anything, the passage of time works against defendant's claim. No one challenged the 1964 or 1968 recall laws. Since the Legislature amended N.J.S.A. 43:6A-13 four decades ago, hundreds of recall judges have served and overseen countless matters. Until very recently, no one challenged that practice either. Defendant's claim, thus, must also surmount the well-settled "policy of our law not to invalidate a statute which has been in force without substantial challenge for many years, unless its unconstitutionality is obvious." In re Incorporation of Loch Arbour, 25 N.J. 258, 265 (1957) (citation omitted); see also Trump Hotels, supra, 160 N.J. at 527 ("The presumption that a statute is constitutional is enhanced when that statute has been in effect and implemented without challenge over an extended period.").

## VII.

As part of its analysis, the dissent points to other state constitutions. The fifty states have taken nearly as many different approaches to judicial retirement. Nineteen states have no mandatory retirement age. See Wisconsin Briefs from the Legislative Reference Bureau, Brief No. 15-5 (Feb. 2015), http://legis.wisconsin.gov/lrb/pubs/wb/15wb5.pdf. States that require retirement set the retirement age at seventy to seventy-five except for Vermont, which calls for retirement at age ninety. Ibid.

48

The states' approaches to recall vary as well.  The dissent notes that some states provide for recall when the state's constitution is silent.  See post at ___ (slip op. at 15-16).  Two variations follow.

The Massachusetts Constitution, like New Jersey's, declares that all judges "shall be retired" at age seventy and "shall be subject to any provisions made by law as to pensions . . . ."  Mass. Const. pt. 2, ch. 3, art. I.  In an advisory opinion discussed earlier, Opinion of Justices, supra, 284 N.E.2d at 913, the Supreme Judicial Court of Massachusetts opined that the quoted language allowed for recall.  The legislature later adopted a series of statutes that empower the chief justice to place a retired judge on a list for recall to the supreme judicial court, the appeals court, or the trial court, depending on the judge's prior service; the respective heads of those courts can then recall the retired judge.  See Mass. Gen. Laws Ann. ch. 32, § 65E & ch. 211, § 24 (Supreme Judicial Court); ch. 32 § 65F & § ch. 211A, § 16 (Appeals Court); ch. 32, § 65G & ch. 211B, § 14 (Trial Court).

New Hampshire's Constitution provides that "[n]o person shall hold the office of judge of any court . . . after he has attained the age of seventy years."  N.H. Const. pt. 2, art. 78.  The State Supreme Court, nonetheless, found a recall statute constitutional because of the legislature's implicit authority

49

to authorize the assignment of retired justices. Claremont Sch. Dist. v. Governor, 712 A.2d 612, 615 (N.H. 1998). The court held that "[a]n integral part of this authority is the legislature's ability to enable a retired justice to exercise authority as a judicial officer on a temporary basis" and thereby "increase[] judicial manpower by making available a greater number of experienced justices." Ibid.

The dissent also points to other state constitutions that expressly provide for recall. See post at ___, ___ (slip op. at 4-5, 13 n.1).

We do not rely on any of the above examples for a number of reasons. First, our obligation is to interpret the words and meaning of the New Jersey Constitution and New Jersey statutory law in light of our State's history. When other states consider recall, they act likewise. Their approaches are grounded in the language and history of their respective state constitutions and laws and tell us little about our own. See Buckner, supra, 437 N.J. Super. at 48 (Harris, J.A.D., dissenting) ("We cannot measure the constitutionality of our recall platform from [a] dissimilar foreign source.").

Second, there is minimal evidence that the framers considered how other states treated recall when they crafted the Judicial Article. In fact, no mention can be found in the record of the Constitutional Convention except for a passing

50

reference that Connecticut allows retired judges to serve as "referees, or masters."  4 Proceedings, supra, at 214.  That is not surprising.  All of the recall provisions in the state constitutions cited by the dissent post-date New Jersey's 1947 Constitutional Convention,[3] and two states, Alaska and Hawaii,[4] had not yet attained statehood status.

---

[3]  Recall provisions were first included in the constitutions of the respective states in the following years:  Alabama-1973, see Johnson v. Bd. of Control of the Emps.' Ret. Sys. of Ala., 740 So.2d 999, 1003-05 (Ala. 1999); Arizona-1958, see John D. Leshy, The Arizona State Constitution 203-04 (2d ed. 2013); Colorado-1967, see State v. Sherrod, 204 P.3d 466, 470 (Colo. 2009); Connecticut-1965, see Fla. Hill Rd. Corp. v. Comm'r of Agric., 321 A.2d 856, 857 (Conn. 1973); Florida-1972, see Fla. Const. art. V, §§ 2, 8; Louisiana-1956, see 1956 La. Acts 1073-74 [Act No. 588] & La. Legis. Council, Amendments to the Constitution of 1921 6; Maryland-1976, see Dan Friedman, The Maryland State Constitution 221-22 (2011); Michigan-1963, see Susan P. Fino, The Michigan State Constitution 142 (2011); Missouri-1976, see Mo. Const. art. V, § 26(3); New York-1962, see Marro v. Bartlett, 389 N.E.2d 808, 813 (N.Y. 1979) (Fuchsberg, J., dissenting); Ohio-1968, see Steven H. Steinglass & Gino J. Scarselli, The Ohio State Constitution 203-04 (2011); Oregon-1958, see Carey v. Lincoln Loan Co., 157 P.3d 775, 779 (Or. 2007); Pennsylvania-1968, see Pa. Const. of 1968, http://www.duq.edu/academics/gumberg-library/pa-constitution/texts-of-the-constitution/1968; Texas-1948, see Werlein v. Calvert, 460 S.W.2d 398, 398 (Tex. 1970); Washington-1962, see Wash. Const. art. IV, § 2(a).

[4]  The Hawaii Constitution has a mandatory retirement age and also allows for recall "[a]s provided by law," Haw. Const. art. VI, §§ 2, 3, yet the State recently considered a ballot question about recall to amend the constitution, Report of the Special Committee on the Mandatory Retirement Age of State Judges, 18 Hawaii B.J. 4, 7 (2014).  We are ill-equipped to explain why Hawaii followed that course, rather than pass a law.  Cf. post at __ (slip op. at 15).

The approaches taken by others, thus, do not offer insight into what the framers of New Jersey's modern Constitution intended.  We note, as well, that the parties place little reliance on the law from other states.

VIII.

Defendant also argues for the first time that the Recall Statute conflicts with the separation of powers doctrine. Defendant did not properly preserve this issue and, in essence, adopts an argument raised by the Appellate Division dissent. Buckner, supra, 437 N.J. Super. at 51-55 (Harris, J.A.D., dissenting).  We briefly address the question and conclude that it lacks merit.

The separation of powers clause of the Constitution directs that one branch of government may not exercise powers that properly belong to another.  N.J. Const. art. III, ¶ 1.  The doctrine is intended to prevent the concentration of power in one branch at the expense of the other two co-equal branches. See In re P.L. 2001, Chapter 362, 186 N.J. 368, 378 (2006); Gen. Assembly v. Byrne, 90 N.J. 376, 381-83 (1982); David v. Vesta Co., 45 N.J. 301, 326 (1965).  Under the Constitution, no single branch can "claim[] or receiv[e] inordinate power."  Brown v. Heymann, 62 N.J. 1, 11 (1972).

At the same time, the concept recognizes that the branches of government are interdependent, not watertight.  In re

52

Advisory Comm. on Prof'l Ethics Op. 705, 192 N.J. 46, 54 (2007); In re Salaries for Prob. Officers of Bergen Cty., 58 N.J. 422, 425 (1971). "[T]he doctrine requires not an absolute division of power but a cooperative accommodation among the three branches . . . ." Commc'ns Workers of Am. v. Florio, 130 N.J. 439, 449 (1992).

We measure the Recall Statute in light of those principles. The Constitution gives the Governor the power to nominate and appoint judges, subject to the advice and consent of the Senate. N.J. Const. art. VI, § 6, ¶ 1. N.J.S.A. 2B:2-1(a), in turn, empowers the Governor to appoint 443 judges to the Superior Court.

Recall does not limit or encroach on the Executive's power. The moment a judge retires, the position becomes vacant, and the Governor may appoint a new judge as a replacement. That is true even if a newly retired judge is recalled, because recall judges do not hold the office of a Superior Court Judge. They are retired, on pension, and serve under the Recall Statute.

Recall is no obstacle to filling any vacancies in the Superior Court. Because defendant cannot show that the Recall Statute clashes with or usurps the Governor's constitutional authority to appoint judges, defendant's separation of powers argument fails.

IX.

In the end, we return to two fundamental principles:  the strong presumption of validity that attaches to every legislative enactment, Hamilton, supra, 156 N.J. at 285; and the Court's obligation to act with "extreme self restraint" before it overrides the Legislature and pronounces a law unconstitutional, McCrane, supra, 61 N.J. at 8.  Before a court can declare a law unconstitutional, it must find proof beyond a reasonable doubt that the statute is clearly repugnant to the New Jersey Constitution.  Franklin, supra, 111 N.J. at 17.

Defendant has not met that burden -- because there is no such proof.  To the contrary, we find ample evidence that the Recall Statute is consistent with both the language and the history of the modern State Constitution.

For the reasons stated above, the judgment of the Appellate Division is affirmed.


JUSTICES LaVECCHIA, FERNANDEZ-VINA, and SOLOMON, and JUDGE CUFF (temporarily assigned)  join in CHIEF JUSTICE RABNER's opinion. JUSTICE ALBIN filed a separate, dissenting opinion. JUSTICE PATTERSON did not participate.

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

       v.

JAMES BUCKNER,

    Defendant-Appellant.


    JUSTICE ALBIN, dissenting.

    The New Jersey Constitution provides that "justices and judges shall be retired upon attaining the age of 70 years." N.J. Const. art. VI, § 6, ¶ 3. It does not provide that justices and judges can be recalled to their offices beyond the age of seventy. It does not empower the Legislature to make laws to recall justices and judges beyond that age.

    The drafters declined to include in the Judicial Article a number of proposed recall provisions presented at the Constitutional Convention. The drafters were keenly aware that three years earlier the people of New Jersey rejected a proposed Constitution that provided for the recall of judges. Undoubtedly, the eminent and able drafters of the 1947 New Jersey Constitution knew how to write a recall provision.

    Nevertheless, the majority conjures a hidden meaning in the

simple, clear, and declarative words, "judges shall be retired upon attaining the age of 70 years" -- a meaning authorizing the Legislature to pass a law that allows the New Jersey Supreme Court to recall judges without any age limit. By the majority's thinking, after setting an age for the end of judicial service, the drafters, by their silence, left open a future scenario that allowed for the Supreme Court to recall judges even at the age of 100.

That strained interpretation of our Constitution cannot be justified by the plain words of the Judicial Article, by the context of those words in relationship to other provisions of the Constitution, by the history that led to the drafting of the Judicial Article, by the debates at the Constitutional Convention, by the absence of any contemporaneous recall legislation after the Constitution's ratification, and by comparison to sister states with similar constitutional retirement provisions that provide for recall of judges in their constitutions.

To be sure, the recall of a talented cadre of retired judges serves an important policy of ensuring the prompt and efficient delivery of justice in a system beset with chronic judicial vacancies due to a dysfunctional political process. There is no legitimate excuse for the Executive and Legislative branches leaving vacancies on the bench of more than ten percent

2

year after year.  But the answer to the problem cannot be to ignore the clear dictates of the Constitution for expedient or other seemingly good reasons.  There is a right way and wrong way to achieve a worthy end.  The Legislature cannot arrogate to itself a power denied to it by the Constitution, and likewise it cannot gift to the Supreme Court a power inconsistent with the Constitution.

If justices or judges are to serve in office beyond the age of seventy, full time or on recall, then the Constitution must be amended.  No reasonable interpretation of the Constitution warrants the current recall system.  Although I would strike down as unconstitutional the legislation permitting recall of a judge over the age of seventy, I would not upset any judgment rendered by a recall judge based on the de facto officer doctrine.  To forestall a short-term catastrophic impact on the judicial process on which the constitutional rights of so many depend, I also would keep the present system in place for a period not to exceed six months to allow the Legislature to pass a conforming amendment, to increase the number of judgeship positions, and/or to fill the multitude of judicial vacancies.

I therefore respectfully dissent.

### I.

### A.

Article VI -- known also as the Judicial Article --

3

provides: "[J]ustices and judges shall be retired upon attaining the age of 70 years. Provisions for the pensioning of the Justices of the Supreme Court and the Judges of the Superior Court shall be made by law." N.J. Const. art. VI, § 6, ¶ 3. Had the drafters of the Constitution -- who were skilled wordsmiths -- intended to authorize the Legislature to enact a recall system Paragraph 3 would have read: "[J]ustices and judges shall be retired upon attaining the age of 70 years. Provisions for the recall and pensioning of the Justices of the Supreme Court and the Judges of the Superior Court shall be made by law." That easy word fix would not have been lost on the drafters.

Other state constitutions with similarly worded mandatory-retirement-age provisions specifically provide for the temporary recall of justices and judges. See, e.g., Alaska Const. art. IV, § 11 ("Justices and judges shall be retired at the age of seventy except as provided in this article."); Mo. Const. art. V, § 26 ("All judges other than municipal judges shall retire at the age of seventy years, except as provided in the schedule to this article . . . ."); Or. Const. art. VII, § 1a ("[A] judge of any court shall retire from judicial office at the end of the calendar year in which he attains the age of 75 years. The Legislative Assembly or the people may by law . . . [p]rovide for recalling retired judges to temporary active service."); Pa.

Const. art. V, § 16 ("Justices, judges and justices of the peace shall be retired on the last day of the calendar year in which they attain the age of 70 years. . . . A former or retired justice or judge may, with his consent, be assigned by the Supreme Court on temporary judicial service . . . ."); Wash. Const. art. IV, §§ 2a, 3a ("A judge of the supreme court or the superior court shall retire from judicial office . . . [when] he attains the age of seventy-five years. . . . [A] majority of the Supreme Court is empowered to authorize . . . retired judges . . . to perform, temporarily, judicial duties . . . .").

Those examples suggest that the word "retire" is not so elastic that it can be imbued with contradictory meanings. To retire does not mean to ascend again. At the time of the 1947 Constitution, "to retire" had distinct definitions: "[t]o withdraw from a public station, or from business; as, having made a large fortune, he retired." Webster's Revised Unabridged Dictionary 1231 (1913); see also The Century Dictionary 5124 (1913) (defining "retire" as "[t]o withdraw from business or active life"); A New English Dictionary 571-72 (1933) (defining "retire" as "[t]o withdraw from office or an official position; to give up one's business or occupation in order to enjoy more leisure or freedom (esp. after having made a competence or earned a pension)"). The magical interpretation that the majority gives to the word "retire" does not conform to the

5

plain meaning of that word as understood by the Constitution's drafters in their time.

The absence of any language about recall in the New Jersey Constitution could end the constitutional analysis.  However, if we look further, every other sign evidences that the drafters did not intend to undermine the constitutional age limit on judicial service with a system that allowed the Supreme Court to appoint recall judges without any age limitation.

B.

Another provision of the Constitution clearly shows that the drafters knew how to allow for judges to hold office beyond the age of seventy.  At the time of the Constitutional Convention, justices and judges were not restricted from service on the bench on the basis of age and were serving a previously set term of years in office.  To cause the least disruption to the judicial system, the new Constitution provided for a conversion period rather than the abrupt dismissal of justices and judges who already were seventy years of age or older.  This was accomplished through the Schedule Article -- Article XI, Section 4, Paragraph 1 of the Constitution.  See Robert F. Williams, The New Jersey State Constitution 197 (2d ed. 2012) (noting that Schedule Article "contains various phase-in provisions designed to facilitate the smooth transition to the 1947 constitution").  The Schedule Article allowed justices and

6

judges over the age of seventy to continue in service for a temporary period. That Article provides: "No Justice of the new Supreme Court or Judge of the Superior Court shall hold his office after attaining the age of seventy years, except, however, that such Justice or Judge may complete the period of his term which remains unexpired at the time the Constitution is adopted." N.J. Const. art. XI, § 4, ¶ 1.

Thus, the drafters knew how to and did write into the Constitution a provision that allowed for judicial service beyond the age of seventy. They knew how to write into the Constitution a recall system, but pointedly did not do so.

C.

Certain clauses of the Constitution, such as the "'great ordinances' are flexible pronouncements constantly evolving responsively to the felt needs of the times." Vreeland v. Byrne, 72 N.J. 292, 304 (1977). Fitting into that category are the "due process clause, the equal protection clause, [and] the free speech clause." Ibid. Other clauses simply frame the "details of governmental administration." Id. at 304-05. There, "a literal adherence to the words of the clause is the only way that the expressed will of the people can be assured fulfillment." Id. at 305. In that category, for example, falls the provision that "'the Governor shall be not less than thirty years of age.'" Ibid. (quoting N.J. Const. art. V, § 1, ¶ 2).

7

The gubernatorial age limit is a peremptory directive not subject to an evolving interpretation over time. The same must be said of the provision that "justices and judges shall be retired upon attaining the age of 70 years." N.J. Const. art. VI, § 6, ¶ 3. Scrupulous adherence should be given to the clear meaning of those words to fulfill the drafters' intent.

## II.

If there were any lingering doubt concerning the meaning of the mandatory-retirement language in the Judicial Article, the history leading up to the adoption of the 1947 Constitution and the debates during the Constitutional Convention dispel it.

The proposed Constitution of 1944, which was not ratified by the people, included a provision that allowed for judges over the mandatory-retirement age of seventy to be recalled for temporary service. That provision read:

> No Justice of the Supreme Court or of the Superior Court shall continue in office after he has attained the age of seventy years. Subject to law, the Chief Justice may assign any such judicial officer who has attained the age of seventy years to temporary service in the Supreme Court or in the Superior Court, as need appears.
>
> [Proposed Revised Constitution (1944), art. V, § 5, ¶ 5.]

The delegates to the 1947 Constitutional Convention had for their consideration the 1944 recall provision in the "Summary of Proposals for Revision of Judicial Article" prepared for the

8

Judiciary Committee.  4 Proceedings of the Constitutional Convention of 1947, at 749.

That, moreover, was not the only proposal for the temporary recall of retired judges before the Convention's delegates.  On behalf of the New Jersey Committee for Constitutional Revision, Evelyn M. Seufert and John Bebout submitted to the Judiciary Committee a draft judicial article containing a provision for the temporary recall of retired judges and justices.  That recall proposal provided:

> No justice or judge shall remain in continuous service after he has attained the age of seventy years; but the chief justice may assign any such judicial officer who has attained the age of 70 years before his term has expired to temporary service in the supreme court or in the general court, as need appears.

> [4 Proceedings, supra, at 28.]

In addition, in commentary to the Judiciary Committee, Seufert stated that the "provision for mandatory retirement at age 70" of judges should be "subject to possible recall to temporary service as need may appear."  4 Proceedings, supra, at 580.

There was yet another recall proposal submitted to the Judiciary Committee, one by former Chief Justice Thomas J. Brogan.  The provision stated:

> Upon the retirement of any such Justice or Judge he shall receive a pension equal in amount to the salary which he is receiving at that time.  Such Justice or Judge shall be

9

> required, if able so to do, to perform such judicial duties and services as may be required of him by designation or order of the Court of Appeals . . . .
>
> [2 Proceedings, supra, at 1207 (emphasis added).]

This recall proposal and the others before the Judiciary Committee were rejected and not made part of the final Judicial Article.

Whether to have a judicial retirement age and, if so, setting a retirement age was debated over nine days and thirteen separate sessions in the Judiciary Committee. See, e.g., 4 Proceedings, supra, at 500, 523-24, 540, 557. In ultimately deciding on seventy as the age for mandatory retirement, the drafters balanced a number of factors. One factor was the wisdom and knowledge that experienced judges bring to the bench. 4 Proceedings, supra, at 484 (noting judges over age of seventy "who are alert, able and have over a long period of years acquired a tremendous wealth of legal thinking, wisdom and judgment" (Judge Thomas Madden)); 4 Proceedings, supra, at 135-36 ("We all remember, doubtless, some instances in which men did some of their best work on the court when they were past 75 years of age." (Chief Justice Clarence E. Case)). Another factor was the concern about incapacity that afflicts older judges. 4 Proceedings, supra, at 24 (noting observations of Vice-Chairman Nathan L. Jacobs that mandatory-retirement age of seventy would

10

reduce frequency of incapacitated judges).  The debates on the Judicial Article included discussions about the option of a system of recalling retired judges to service.  See, e.g., 4 Proceedings, supra, at 543 (noting suggestions of Judge Robert Carey that mandatory-retirement age be set at seventy-five and that retired judges be placed on "inactive list" subject to recall); 4 Proceedings, supra, at 168 (noting Wayne D. McMurray's remarks that retired judges could be subject to recall).

Despite the proposed recall provisions and discussions before the Judiciary Committee, the drafters did not write recall into the Constitution or give the Legislature the authority to do so.

This is not the first time that this Court has construed the import of the absence of a provision in a Constitution.  In Committee to Recall Robert Menendez from the Office of U.S. Senator v. Wells, 204 N.J. 79, 86-87 (2010), we held that New Jersey's constitutional provision allowing for a recall election of a United States Senator, N.J. Const. art. I, ¶ 2, subject to a six-year term of office, violated the Federal Constitution. In reaching that conclusion, we emphasized that the United States Constitution did not have a recall provision whereas the prior Articles of Confederation did.  Id. at 85-86.  We also noted that a proposal to include a recall provision in the new

11

Constitution was voted down. Id. at 86. From that record, we reasoned that "the Framers rejected a recall provision and denied the states the power to recall U.S. Senators." Ibid.

The result the majority reaches in this case does not square with that interpretative analysis. The drafters did not incorporate into the 1947 Constitution the judicial recall provision in the proposed 1944 Constitution. They also evidently rejected the recall proposals advanced at the Constitutional Convention. The obvious conclusion should be that legislation permitting the recall of judges over the age of seventy runs afoul of the Constitution.

That conclusion is supported by a retrospective interview of Morris M. Schnitzer, the Technical Advisor to the Judiciary Committee of the 1947 Convention. Conversations with Morris M. Schnitzer, 47 Rutgers L. Rev. 1391 (1995). During the interview, Schnitzer observed that the judicial retirement age was adopted to banish the spectacle of aged and mentally incapacitated judges presiding over cases. Id. at 1400-01. When asked whether "it [was] contemplated that judges, once retired at age 70, could be recalled" for temporary service, Schnitzer replied, "Certainly not, since that would have resurrected the example of [judges] who sat long after their peak." Id. at 1401.

III.

12

The majority's reading into our Constitution a legislative right to authorize the recall of retired judges over the age of seventy is contrary to the approach taken by most other states with a constitutional mandatory-retirement provision. Nineteen state constitutions set a mandatory-retirement age for judges. Sixteen of those state constitutions also specifically provide for the recall of retired judges who have aged out.[1] Those

---

[1] See Ala. Const. art. VI, § 155 ("[A] judge over the age of seventy may be appointed to the office of supernumerary judge if he is not eligible to receive state judicial retirement benefits."); Alaska Const. art. IV, § 11 ("Retired judges shall render no further service on the bench except for special assignments as provided by court rule."); Ariz. Const. art. VI, § 20 ("A retired judge who is temporarily called back to the active duties of a judge . . . ."); Colo. Const. art. VI, § 5 ("Whenever the chief justice deems assignment of a judge necessary to the prompt disposition of judicial business, he may . . . assign any . . . retired justice or district, probate, or juvenile judge who consents, temporarily to perform judicial duties in any court."); Conn. Const. art. V, § 6 (providing that supreme court, superior court, and common pleas judges who have attained age of seventy years may serve as state referees with powers of judicial office); Fla. Const. art. V, § 8 ("No justice or judge shall serve after attaining the age of seventy years except upon temporary assignment or to complete a term, one-half of which has been served."); La. Const. art. V, § 5 ("The supreme court . . . may assign a sitting or retired judge to any court."); Md. Const. art. IV, § 3a (providing that, with approval of Court of Appeals, former judges may serve "temporarily in any court of this State, except an Orphans' Court"); Mich. Const. art. VI, § 23 ("The supreme court may authorize [certain former] judges to perform judicial duties for limited periods or specific assignments."); Mo. Const. art. V, § 26 ("Any retired judge . . . may be assigned by the supreme court as a senior judge to any court in this state . . . ."); N. Y. Const. art. VI, § 25 ("A retired judge or justice shall serve no longer than . . . the year in which he or she reaches the age of seventy-six."); Ohio Const. art. IV, § 6 ("Any voluntarily retired judge, or any judge who is retired under this section,

13

sixteen states apparently concluded that such judicial-recall clauses were necessary in light of the mandatory-retirement-age provisions in their constitutions.

Three other state constitutions include a mandatory-retirement age but no provision for the recall of judges who have reached mandatory retirement. See Haw. Const. art. VI, § 3 ("Justices and judges shall be retired upon attaining the age of seventy years."); N.H. Const. pt. 2, art. 78 ("No person shall hold the office of judge of any court, or judge of probate, or sheriff of any county, after he has attained the age of seventy years."); Mass. Const. pt. 2, ch. 3, art. I ("[T]hat upon attaining seventy years of age said judges shall be retired.").

The Hawaii Constitution has a mandatory-retirement age for judges, Haw. Const. art. VI, § 3 ("Justices and judges shall be retired upon attaining the age of seventy years."), as well as a

---

may be assigned with his consent . . . to active duty as a judge . . . ."); Or. Const. art. VII, § 1a ("The Legislative Assembly or the people may by law . . . [p]rovide for recalling retired judges to temporary active service on the court from which they are retired . . . ."); Pa. Const. art. V, § 16 ("A former or retired justice or judge may, with his consent, be assigned by the Supreme Court on temporary judicial service as may be prescribed by rule of the Supreme Court."); Tex. Const. art. V, § 1-a (providing "reassignment to active duty [of retired judges] where and when needed"); Wash. Const. art IV, §§ 2a, 3a ("When necessary for the prompt and orderly administration of justice a majority of the Supreme Court is empowered to authorize judges or retired judges . . . to perform, temporarily, judicial duties . . . .").

provision allowing for the recall of retired judges, Haw. Const. art. VI, § 2 ("[A]t the request of the chief justice, retired justices of the supreme court also may serve temporarily on the supreme court, and retired judges . . . may serve temporarily on the [lower courts] . . . ."). The recall provision evidently has not been construed to permit the recall of judges over the age of seventy. The Hawaii Judiciary expressed its support for a constitutional amendment, stating that "the knowledge and experience of such judges are recognized as valuable resources not only as judicial mentors but also to help provide fair and timely disposition of cases." Hearing on S.B. 650 Before the Haw. S. Judiciary & Labor Comm., 26th Leg. (Feb. 14, 2012) (statement of Rodney A. Maile, Admin. Dir. of the Courts). In 2012, a constitutional amendment was placed before the voters that would have allowed the state's chief justice to appoint retired judges over the age of seventy as "emeritus judges" to temporarily serve for no longer than three months. Haw. S.B. 650, 26th Leg. (2011). The amendment was voted down.

Only two states with a mandatory-retirement provision and no recall clause in their state constitutions -- New Hampshire and Massachusetts -- have permitted retired judges to be temporarily assigned for service based on legislative authorization. Claremont Sch. Dist. v. Governor, 712 A.2d 612

15

(N.H. 1998); Opinion of Justices, 284 N.E.2d 908 (Mass. 1972).

The New Hampshire Supreme Court concluded that the state legislature has "the constitutional authority to authorize limited temporary assignment of retired justices over age seventy to ensure the adequate and orderly administration of justice," but that those "retired justices over age seventy [are not invested] with the panoply of powers associated with judicial office."  Claremont, supra, 712 A.2d at 615.

The Supreme Judicial Court of Massachusetts held in an advisory opinion to the Massachusetts Senate, Opinion of Justices, supra, 284 N.E.2d at 913, that the temporary recall of judges and justices by legislation would be permitted despite a proposed constitutional amendment, which stated that "upon attaining seventy years of age . . . judges shall be retired." Without the legislation, which was similar to the Schedule Article in the New Jersey Constitution, N.J. Const. art. XI, § 4, ¶ 1, then-serving judges over the age of seventy under the then-existing system (nearly twenty percent of the judiciary) would have been removed immediately upon the ratification of the constitutional amendment, causing a severe and abrupt disruption of the judicial system.  Id. at 911-13.  In reaching its decision, the Massachusetts high court gave "great weight" to the "unusual and pragmatic considerations" involved as well as to "public policy considerations."  Id. at 913.  The advisory

16

opinion does not explain why "pragmatic" and "public policy considerations" were compelling reasons for bypassing the amendment process.

Even accounting for the New Hampshire and Massachusetts experiences, the majority's approach is an outlier.

IV.

For more than a quarter century after ratification of the New Jersey Constitution, this State had no judicial recall system. The initial Judicial Retirement System Act, L. 1973, c. 140, passed in 1973, only allowed for the recall of judges who had not yet attained the age of seventy, L. 1973, c. 140, § 13. Setting a mandatory-age limit for recall presumably reflected the Legislature's understanding that the recall of judges over the age of seventy was prohibited by the Judicial Article.

In 1975, the Legislature passed into law the present judicial recall system, which allows retired justices and judges over the age of seventy to be recalled for temporary service. L. 1975, c. 14. The Recall Statute provides that "[s]ubject to rules of the Supreme Court," retired Supreme Court justices over the age of seventy may "be recalled by the Supreme Court for temporary service in the Supreme Court or elsewhere within the judicial system" and that Superior Court judges over the age of seventy may be recalled "for temporary service within the judicial system other than the Supreme Court." N.J.S.A. 43:6A-

17

13(b).  The Recall Statute also endows the retired justice or judge with "all the powers of a justice or judge of the court to which he is assigned."  N.J.S.A. 43:6A-13(c).

The legislation limits the Supreme Court only to its own rules.  Thus, per the Recall Statute, the Supreme Court could, if it wished, promulgate a rule that permits the temporary recall of justices and judges who do not exceed the age of 100 -- and, according to the majority, that would be consistent with the Constitution's mandatory-retirement age.[2]  Additionally, the Recall Statute invests the Supreme Court with the power to recall retired justices to fill temporary vacancies on the Supreme Court, despite the clear conflict with Article VI, Section 2, Paragraph 1 of the State Constitution.  That constitutional provision allows for the Chief Justice only to "assign the Judge or Judges of the Superior Court, senior in service . . . to serve temporarily in the Supreme Court."  N.J. Const. art. VI, § 2, ¶ 1.  Thus, the Recall Statute unlawfully authorizes the Supreme Court to bypass our Constitution's prescribed method for filling vacancies on this Court.

---

[2]  Pursuant to the Recall Statute, N.J.S.A. 43:6A-13, the Court has promulgated Directive 12-01, "Policy Governing Recall for Temporary Service Within the Judicial System" (effective Sept. 1, 2001).  The Directive states that "[n]o retired justice or judge shall serve on recall beyond his or her eightieth birthday."  That Directive is simply the Court's own policy determination.

18

The recall legislation is clearly laudatory, but it is not constitutional. Before the passage of the current statute in 1975, the New Jersey Supreme Court requested the views of the Bar "with respect to questions concerning the retirement of judges who have reached the age of 70 years." The majority references the 1974 report of the Bar Institute and Law Center of New Jersey submitted to the Court and two New Jersey Law Journal editorials published that year. The Bar Institute's report "conclude[d] that our retired judges should be permitted to return to the bench according to the needs of our court system and according to their abilities to render such service." The Bar Institute and Law Center of New Jersey, Recall of Judges Past the Age of Mandatory Retirement: An Examination of the Pertinent Issues 14 (Oct. 1974). The report did not conclude that enactment of a statute would pass muster under the Constitution. The 1974 Law Journal editorials calling for the amending of the 1973 Recall Statute to allow for retired judges over the age of seventy to be returned to temporary judicial service contained no meaningful constitutional analysis, and cited no authority other than the Massachusetts advisory opinion. Senior Judges, 97 N.J.L.J. 68 (Jan. 31, 1974); Judicial Service for Judges Retired at Age 70 Who Wish Such Service, 97 N.J.L.J. 188 (Mar. 21, 1974). The 1974 Law Journal editorials endorsing a recall statute, and the more recent Law

19

Journal editorials claiming that the Recall Statute is unconstitutional, cannot guide our decision-making process. Recalling the Recalled Judges, 216 N.J.L.J. 470 (May 19, 2014); Judges We Can't Recall, 206 N.J.L.J. 742 (Nov. 28, 2011); 70 and Out, 194 N.J.L.J. 962 (Dec. 15, 2008).

In the end, this Court is the final arbiter of the Constitution. Although the Legislature's policy reasons for enacting the Recall Statute are praiseworthy (to "help speed the administration of justice and, by securing the benefit of years of judicial experience, increase the quality of justice," Statement to A. No. 1419 (Apr. 1, 1974)), those reasons do not render the Statute constitutional. Moreover, a law's constitutionality does not turn on public opinion or how it favors the Bar or even the judicial process. The Constitution must be followed even if a true interpretation leads to a result that is not consonant with the immediate interests of the judiciary as an institution.

That is a lesson passed on to us from the landmark case of Marbury v. Madison, 5 U.S. 137, 2 L. Ed. 60 (1803), which stands for the bedrock principle of judicial review and the primacy of the Constitution over legislation. The issue in Marbury bears a noticeable similarity to the one before us, however different the facts of the two cases may be. The outgoing President, John Adams, appointed William Marbury a justice of the peace, but

Marbury's commission had not been physically delivered to him before the administration's final day. Id. at 155, 2 L. Ed. at 66. Marbury sought a writ of mandamus from the Supreme Court ordering the new administration's Secretary of State, James Madison, to give him his commission. Id. at 153-54, 2 L. Ed. at 66. The Judiciary Act of 1789 conferred on the United States Supreme Court original jurisdiction to issue writs of mandamus. Id. at 173, 2 L. Ed. at 72. In an opinion written by Chief Justice Marshall, the Supreme Court held that it did not have jurisdiction to issue the writ because the Judiciary Act unconstitutionally expanded the Court's original jurisdiction. Id. at 176, 2 L. Ed. at 73. The Supreme Court struck down that portion of the Judiciary Act that arrogated to the Court a power not vested in it by the Constitution. Id. at 180, 2 L. Ed. at 74.

Here, the Recall Statute arrogates to the New Jersey Supreme Court a power not vested in it by the Constitution -- the power to assign retired judges over the age of seventy to active, temporary service in the judiciary in violation of the Judicial Article.

V.

Although I would declare the Recall Statute unconstitutional as it applies to those retired judges over the age of seventy, no judgment rendered by a recall judge would

have been threatened. Under the de facto officer doctrine, a judge's acts "undertaken in good faith and prior to a judicial declaration of nullity have the force and effect of law notwithstanding a constitutional defect in the enabling legislation." State v. Celmer, 80 N.J. 405, 418 (1979). Thus, had my view prevailed, the ruling would not have applied retroactively, except to the defendant who brought the issue before this Court. Additionally, I would have delayed implementation of the decision for 180 days to allow the Executive and Legislative branches time to remedy the constitutional infirmity. See Lewis v. Harris, 188 N.J. 415, 463 (2006) (giving Legislature 180 days to amend marriage statutes or enact alternative legislation to provide equal rights to same-sex couples). During that time, the Legislature would have had a number of options. It could have begun the process of amending the Constitution to allow for the recall of retired judges or to extend the retirement age of judges to, say, seventy-five. It could have created more judgeship positions or, at the very least, filled the many vacancies that so limit the judiciary's ability to fulfill its mission. It still can.

Justice suffers when the judiciary is understaffed. The oft-heard refrain, "Justice delayed is justice denied," is true. Cases that are not heard timely compromise the rights of

22

litigants.  As of July 1, 2015, there were forty-six vacancies among the 443 Superior Court judgeships authorized by statute, N.J.S.A. 2B:2-1, with seventy-two judges serving on recall, fifty-five of whom are above the mandatory age of retirement. By failing to timely fill the many judicial vacancies, the political branches have created the urgent need for and the judiciary's dependency on the recall system.  However effective the recall system may be, politically created exigencies and pragmatic considerations cannot excuse the use of unconstitutional means to achieve a desirable end.

VI.

Recall judges have served ably and with distinction, and for little compensation.  They are to be commended for their selfless service.  However, the Recall Statute is in conflict with our State Constitution.  Today, by upholding that Statute, the majority gives to the Supreme Court a power not conferred to it by the Judicial Article of the New Jersey Constitution.

I therefore respectfully dissent.

23

SUPREME COURT OF NEW JERSEY

NO. ___A-22___                          SEPTEMBER TERM 2014
ON APPEAL FROM _____Appellate Division, Superior Court_____


STATE OF NEW JERSEY,

      Plaintiff-Respondent,

           v.

JAMES BUCKNER,

      Defendant-Appellant.


DECIDED _____July 30, 2015_____
_____Chief Justice Rabner_____ PRESIDING
OPINION BY _____Chief Justice Rabner_____
CONCURRING/DISSENTING OPINION BY_____
DISSENTING OPINION BY ____Justice Albin_____

| CHECKLIST | AFFIRM | DISSENT |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | | X |
| JUSTICE PATTERSON | -------------------- | -------------------- |
| JUSTICE FERNANDEZ-VINA | X | |
| JUSTICE SOLOMON | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 5 | 1 |