# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4368-18

A.F.,[1]

     Plaintiff-Respondent,

v.

M.M.,

     Defendant-Appellant.

_____

Argued February 1, 2021 – Decided March 10, 2021

Before Judges Gooden Brown and DeAlmeida.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket No. FV-03-1477-19.

Joseph J. Rogers argued the cause for appellant.

Mark J. Molz argued the cause for respondent.

PER CURIAM

---

[1] We use initials to protect the confidentiality of the victim. <u>R.</u> 1:38-3(c)(12).

Defendant M.M. appeals from the entry of an April 29, 2019 Final Restraining Order (FRO) issued against him pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35, following a finding of the predicate act of harassment. Plaintiff A.F. and defendant, a Florida law school graduate, had a dating relationship and lived together for about four months prior to the entry of a Temporary Restraining Order (TRO) on March 11, 2019, approximately two months after they had broken up. On that date plaintiff filed a domestic violence complaint and sought a TRO alleging harassment based on defendant showing up at her door unannounced the day before, after she had previously told him never to return to her apartment or contact her, and emailing her the following morning that he would drop the lawsuit he had filed against her and her mother if she talked to him. The complaint also detailed a prior history of domestic abuse, including threats, derogatory name calling, and unwelcome communications. At the ensuing FRO hearing, the trial judge, who was assigned on recall, found that plaintiff sustained her burden of proof and, after an analysis of the two-part test set forth in Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006), entered the FRO against defendant.

On appeal, defendant raises the following points for our consideration:

A-4368-18

POINT I

SINCE THE RECALL OF THE TRIAL JUDGE WAS IMPROVIDENTLY GRANTED, THE FINAL RESTRAINING ORDER MUST BE VACATED (NOT RAISED BELOW).

POINT II

SINCE THE TRIAL COURT CONCLUDED UPON THE FACTS BEFORE IT THAT PLAINTIFF DID NOT PROVE EITHER PREDICATE ACT, THE COURT ERRED BY ISSUING A FINAL RESTRAINING ORDER BASED SOLELY UPON THE HISTORY OF THE PARTIES.

We reject these contentions and affirm.

I.

At the FRO hearing conducted on April 29, 2019,[2] plaintiff testified that she and defendant had an "online" dating relationship that started in 2016 while she resided in New Jersey and defendant "was residing in Florida." Plaintiff stated the couple would also "alternate . . . visiting each other" for "a week at a time." After graduating from law school in 2018, defendant moved "back to New Jersey and bounced [around] between family members for approximately eight . . . to nine months." In August 2018, plaintiff leased a one-bedroom

---

[2] A prior trial date was adjourned at defendant's request. During the trial, defendant was self-represented while plaintiff was represented by counsel.

A-4368-18

"apartment in [her] name" and the couple lived there together for a few months with defendant contributing "$400 [per] month on average" towards living expenses.[3] However, "[t]owards the end of December [2018]," as defendant had difficulty securing stable employment, the relationship began to devolve into one characterized by constant "arguing."

On the night of January 17, 2019, the couple had a verbal altercation that continued until approximately 5:00 a.m. the following morning, "last[ing] . . . approximately five hours." The altercation, which plaintiff recorded in part, was prompted by plaintiff's request that defendant move out of the apartment and consisted primarily of defendant yelling, threatening, and insulting plaintiff and her family members with derogatory name calling while striking himself in the head.

The following recording of the altercation, which was authenticated by plaintiff, was played during the hearing with the aid of a transcript prepared by plaintiff:

> Defendant:  . . . .  You need to see a lawyer because you're going to get fucked.
>
>            . . . .

---

[3]  The lease term was thirteen months for a total lease amount of $14,700, payable in installments of "[$]1250 a month."

A-4368-18

Defendant: You're going to be losing that job. . . .

Plaintiff: No, I'm not.

Defendant: Yes, you are.

Plaintiff: And why do you just keep on hitting yourself in the head?

. . . .

Plaintiff: . . . . I'm not going to continue to have this argument at 5:00 in the morning.

. . . .

Plaintiff: I already gave you an extra month.

. . . .

Defendant: You're a liar like your mother.

Plaintiff: No.

Defendant: Yes, your mother's a lying, fat whore. That's what she is.

. . . .

Defendant: I'm going to sue you. You don't understand.

. . . .

Plaintiff: - - I made the biggest mistake trying to give you an extra month to be able to transition, and now you're not doing anything and you just continue - -

Defendant: I don't have a motherfuckin' job. What more do you want me to do? (Inaudible).

Plaintiff: You're hitting yourself in the face.

Defendant: (Inaudible) I have nowhere to go. That's why . . . . I have nowhere, nowhere at all. . . .

Plaintiff: Well, you need to chill out.

. . . .

Plaintiff: You are an adult.

Defendant: You stupid fucking motherfucker. You're stupid like that fucking dirty fucking pig.

. . . .

Defendant: . . . . You're really fucking stupid.

. . . .

Plaintiff: You start making plans to go somewhere else.

Defendant: Yeah, where is somewhere else?

Plaintiff: You talk to your mother, you talk to your grandparents.

Defendant: (Inaudible). They're not going to help me. . . .

Plaintiff: That's not my problem.

Defendant: Oh, it's not my fault (inaudible).

Plaintiff: . . . [T]his is not a healthy relationship - -

6

Defendant: (Inaudible). I'm going to sue her for everything she's worth.

Plaintiff: Okay.

Defendant: I'm going to sue her for fraud. I'm going to use her Facebook messages. She's going to have to go to court. I'm going to file a criminal complaint against you for whatever I can (inaudible). Win or lose, let them call fraud. I mean all I know is, the cop saw a fucking mark on me. I don't give a fuck. You're going to lose your fucking job.

Plaintiff: No, I'm not.

Defendant: Yes, and you have to report that.

Plaintiff: Okay. But . . . it has nothing to do with my job - -.

Defendant: Yes, it does.

. . . .

Defendant: If you have a criminal charge, the state law says you can't work in a school until the charge is disposed of.

Plaintiff: Okay . . . .

Defendant: And you're okay with me being in the situation that I'm in.

Plaintiff: I'm not okay, but I'm not putting you in that situation.

Defendant: Yes, you are.

7

. . . .

Defendant: You're a sick, fucking whore with bipolar disorder. (Inaudible). I have nowhere to go. Nowhere.

Plaintiff: Okay. That's not my problem. You're [thirty-two] years old. Stop hitting yourself in the head.

. . . .

Defendant: You . . . have no idea what's coming your way.

Plaintiff: Okay.

Defendant: I'm going to file a charge.

Plaintiff: Okay.

Defendant: What would you do if you lost your job? You'd kill yourself.

Plaintiff: No, I wouldn't . . . .

Defendant: . . . [O]nce you're having any kind of domestic violence charge, you're done.

Plaintiff: . . . I'm not afraid of you. I will handle whatever I need to handle.

. . . .

Defendant: No, you fucking retard. Where am I supposed to go now? Where? Where? (Inaudible).

Plaintiff: Please stop.

8

Defendant: No. You're a fucking stupid bitch like that fucking big, fat fucking pig (inaudible). Where am I supposed to go . . . .

    . . . .

Plaintiff: You're not my problem.

Defendant: Bullshit, . . . . [Your] father's going to lose his gun permit.[4] It's gonna get bad . . . .

    . . . .

Plaintiff: Why are you hitting yourself in the head?

Defendant: Because . . . . I have nothing to live for. . . .

Plaintiff: Because . . . relationship[s] breakdown (inaudible).

Defendant: I paid money for [the] security deposit. I paid money for rent. I paid money for you.

    . . . .

Defendant: I want that fuckin' money back, you fucking scumbag. (Inaudible).

Plaintiff: You have not paid me. I live here.

Defendant: But that security deposit, I'm entitled to that.

    . . . .

---

4 Plaintiff's father was a retired law enforcement officer.

Defendant: That's right. You're gonna have to pay me - - you're going to have to pay me (inaudible) the difference for rent for the rest of the weeks under the law.

. . . .

Defendant: I don't need a fucking (inaudible). All right? This is gonna get bad.

Plaintiff: I told you that I would figure out the - - security deposit, okay? I told you that.

Defendant: (Inaudible) for over $100,000.

Plaintiff: Okay . . . .

Defendant: You want me out of here (inaudible).

Plaintiff: Just - - I don't care.

Plaintiff testified that when defendant was hitting himself in the head, she "thought he was going to try to file criminal charges against [her] and say that [she] caused those injuries." Defendant had told her that having "a mark on him" would support his domestic violence allegation against her and cause her to lose her job "contract[ing] with schools."

The following day, January 19, 2019, in order "to avoid an[other] altercation," plaintiff "went to [her] parents' [home]" after work. However, after learning that defendant had "left [the apartment] on his own[,]" plaintiff

10

"returned to the apartment the next morning," and promptly sent defendant a text message stating:

> Never return to this apartment.  Throw the keys away.
> I am changing the locks.  We are done.  Never contact
> me again.  Or I am getting a restraining order.  You
> have threatened me and harassed me for the last time.
> I'm done.  This relationship is done.

Plaintiff testified that after the break-up, she told defendant to leave her alone on numerous occasions.  Nonetheless, defendant continued to communicate with her through emails.  On March 10, 2019, after returning home from work, plaintiff "heard a knock at [her] door."  When she opened it, she saw defendant "standing at the door."  Immediately, she "shut the door, said no, locked . . . and deadbolted [the door] and called the police."  She heard defendant saying "[']come on['] . . . through the door."  The following morning, March 11, 2019, defendant emailed plaintiff stating that she "owed him money," "that he would do whatever was necessary so that he could get that money back," and "that he had legal tenant rights to the apartment."[5]

Plaintiff testified that in February 2019, defendant had in fact filed a lawsuit against her and her mother as he had threatened in the January 18

_____

[5] On cross-examination, plaintiff acknowledged that she was mistaken about the date of the email.

A-4368-18

altercation. In connection with the lawsuit, defendant had also served a subpoena duces tecum upon plaintiff's sister on March 1, 2019, for her and her husband's "driver's license" and "social security card," as well as "[p]rinted [c]opies of . . . Facebook conversations" with family members. Plaintiff testified that she was seeking a restraining order because she "did[ not] feel safe in the apartment" and she wanted the abuse to stop.

Defendant testified on his own behalf. He admitted showing up unannounced at plaintiff's apartment on March 10 after plaintiff had told him not to return to the apartment following the January 18 altercation. However, defendant claimed he had no intent "to harass or annoy [plaintiff]" and only "stopp[ed] by [the apartment] . . . to obtain or retrieve [his] Social Security card" for "a job interview the next day."[6] Defendant produced e-mails about job opportunities for him that plaintiff had received and forwarded to him on January 21, 2019, after the January 18 altercation, to support his position that

---

[6] Plaintiff testified that on February 11, 2019, after "box[ing] all of [defendant's] possessions," she had "mailed [them] . . . to his grandfather['s] . . . address."

A-4368-18

plaintiff was inviting continued contact and communication between the parties.[7]

Defendant acknowledged that he and plaintiff "were living together and cohabitating" and explained that the January 18 altercation reflected "what was best described at that time as a very hostile and toxic relationship." To justify his comments during the January 18 altercation, defendant relied on his firm belief that he had "legal rights . . . to be in th[e] apartment" because he was a sub-lessee of plaintiff and had paid her rent and other monies towards the security deposit. Defendant explained that they were "simply . . . involved in a financial dispute where [plaintiff] wanted [him] to vacate the apartment after [he] had already spent [his] last dime and at least six to [$8000] over the course of the four to five months that [they had] lived together." He stated he had "told her that she had to provide [him] with eviction notice" but "she continually refused."

Defendant also testified that the basis for the $100,000 lawsuit he had filed against plaintiff and her mother was the fact that "there were several

---

[7] The emails were admitted into evidence. In the first e-mail, plaintiff specified that defendant should "not respond to [her]." However, in the second e-mail, plaintiff stated, "Don't not respond to me." Defendant seized on the double negative to support his claim of, at the very least, mixed messages.

A-4368-18

misrepresentations" made that he relied upon in moving "from Florida to New Jersey, which essentially deprived [him] of a place to live and of livelihood opportunity." According to defendant, when he emailed plaintiff to discuss the lawsuit, plaintiff was not represented by counsel at the time, and any "pleadings" or "communications" about "settlement offer[s]" had to "be sent to her" directly "under the court rules."

Following the hearing, the judge granted the FRO. Initially, the judge determined that jurisdiction was established "under the [PDVA]" based on the parties having "a dating relationship" that began in 2016 while defendant "was living in Florida" and led to them "living together" in New Jersey in 2018 after "plaintiff leased an apartment." The judge continued:

> Sometime in the later evening of March 10th, 2019 the defendant, who had left the apartment . . . about a month before, returned, knocked on the door. When the plaintiff opened the door, there were only a few words exchanged, unremarkable. It was clear that the defendant wanted to speak to the plaintiff. She said no. She closed the door and she called the police.
>
> The following morning, the defendant emailed the plaintiff to inform her that if she would talk to him, he would then drop a civil lawsuit that he had filed against her and her mother on or about February the

25th.[8]   That's the extent of the allegation of [the] predicate [acts].

Standing by . . . themselves, the first aspect of that, the coming to the house, offers nothing by way of establishing the predicate offense of harassment.  At first blush, the second -- allegation, the email, would not seem either to establish the predicate of harassment.  But . . . the case law requires me to fully consider the history between the parties in determining whether the predicate offense of harassment has occurred.

Relying on N.J.S.A. 2C:33-4(a), which proscribes communications made in any manner likely to cause annoyance or alarm, the judge explained that:

The parties had a five-hour or so conversation, using that term loosely, on January the 18th that concluded sometime around . . . 5 a.m.  The plaintiff had made it clear to defendant that she wanted him to leave the apartment.

. . . .

So on January 18th, after it's been made clear to the defendant that the plaintiff wishes him to leave the apartment, which is leased to her, and without getting into the weeds of who was paying what and . . . for what, because I frankly don't find it material to the issue at hand, the defendant said these things to the plaintiff, who remained calm throughout the conversation.

. . . .

---

[8]  Although plaintiff acknowledged on cross-examination that she was mistaken about the date of the e-mail, defendant admitted communicating directly with plaintiff about the lawsuit purportedly because she was self-represented.

Given the time of day, given the content of the communication, putting aside the fact whether that is harassment, because it's unnecessary for me to find there was harassment because it's not part of the predicate, it was threatening and it was extremely coarse. Its purpose was to dissuade the plaintiff from throwing the defendant out of the apartment, and there were threats. It was about finances.

During his testimony, . . . he said, "We were involved in a financial dispute." So all this coarse, threatening, intemperate language that was captured on the recording was intended to exercise control over the plaintiff to dissuade her from throwing him out of the apartment. And he used colorful, offensive language.

He used threats against her job, threats of criminal charges, but he wasn't even sure what the criminal charges might be for. . . .

So he was threatening her; he was threatening her mother; he was threatening her father as leverage against her desire to get him out of the apartment.

He followed that up by following through with his . . . threat to file a lawsuit. . . . One of the exhibits evidences his trying to drag her sister into this lawsuit.

So when he went to the house on the 10th of March and followed up with the email saying, if you talk to me -- this is paraphrasing -- I'll drop the lawsuit. That statement carried the import of everything that was on the audio, carried the import of the vexatious, if not nuisance, lawsuit. And, you talk to me or all of this will continue; you risk having all of this continue because I want control. I want the ability to make you talk to me.

A-4368-18

It is classic domestic violence. Power and control. It's . . . an unusual combination of vehicles to achieve that, but I firmly believe that's what the email intended to do, . . . with intent to harass, to annoy her or alarm her.

. . . .

For those reasons, I find that the plaintiff has established by a preponderance of the evidence the predicate offense of harassment under subsection [(a)]. And I also find, given all of those facts, that there is every reason to believe that without the continuing aid of a restraining order, the plaintiff would be subject to more of this.

The judge entered a conforming order and this appeal followed.

II.

Defendant first argues that the judge who was on recall "sat in this case without constitutional authority." Defendant asserts that because the judge "was not reappointed [by the governor] at the expiration of his initial seven year term" and "did not retire," "he no longer had the status of a superior court judge and should not have been recalled." We disagree.

In State v. Buckner, in rejecting a constitutional challenge to the Recall Statute, N.J.S.A. 43:6A-13, our Supreme Court reconciled "two provisions of law: part of the Judicial Article of the State Constitution, N.J. Const. art. VI, §

17

6, ¶ 3, and the Recall Statute, N.J.S.A. 43:6A-13(b)." 223 N.J. 1, 6 (2015). The former provides in pertinent part that

> [t]he Justices of the Supreme Court and the Judges of the Superior Court shall hold their offices for initial terms of 7 years and upon reappointment shall hold their offices during good behavior . . . . Such justices and judges shall be retired upon attaining the age of 70 years. Provisions for the pensioning of the Justices of the Supreme Court and the Judges of the Superior Court shall be made by law.
>
> [Ibid. (quoting N.J. Const. art. VI, § 6, ¶ 3).]

"In the context of Paragraph 3, 'retire' means an end to a seven-year or tenured term of service, and the start of 'pensioning.'" Id. at 17.

The Recall Statute in turn provides, in part, that "[s]ubject to rules of the Supreme Court . . . any judge of the Superior Court . . . who has retired on pension or retirement allowance may, with his consent, be recalled by the Supreme Court for temporary service within the judicial system other than the Supreme Court." Id. at 7 (quoting N.J.S.A. 43:6A-13(b)). After detailing the history of both provisions, the Court concluded that the "recall law . . . violates neither the plain language of the State Constitution . . . nor the separation of powers doctrine." Id. at 6.

Here, pursuant to the recall order entered by the Chief Justice on March 20, 2018, the judge in question "retired on pension and having given his

consent," was "recalled by the Supreme Court for temporary service within the judicial system . . . for two years effective immediately . . . ." Thus, at the time of the FRO hearing on April 29, 2019, the judge maintained his recall status. Contrary to defendant's contention, neither Article VI, Section 6, Paragraph 3 of the New Jersey Constitution, nor the Recall Statute, N.J.S.A. 43:6A-13(b), requires reappointment by the governor for a retired judge to be duly recalled for temporary service. As the Buckner Court explicitly held, the Recall Statute neither violates "the State Constitution" nor "the separation of powers doctrine," and neither "clashes with [n]or usurps the Governor's constitutional authority to appoint judges." 223 N.J. at 38.

Turning to defendant's challenge to the entry of the FRO, "[b]ecause of the family courts' special jurisdiction and expertise in family matters," our review of a family court's factual conclusions is deferential. Cesare v. Cesare, 154 N.J. 394, 413 (1998). "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Id. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). Thus, we will "not disturb the 'factual findings and legal conclusions of the trial judge unless [we are] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to

19

offend the interests of justice.'" Ibid. (quoting Rova Farms Resort, Inc. v. Inv'rs. Ins. Co., 65 N.J. 474, 484 (1974)). "On the other hand, where our review addresses questions of law, a 'trial judge's findings are not entitled to that same degree of deference if they are based upon a misunderstanding of the applicable legal principles.'" R.G. v. R.G., 449 N.J. Super. 208, 218 (App. Div. 2017) (quoting N.T.B. v. D.D.B., 442 N.J. Super. 205, 215 (App. Div. 2015)).

Defendant argues the judge "did not abide by the two-pronged analysis . . . enunciated in [Silver,]" and erred by justifying the issuance of the FRO "based solely upon [his] perception of the prior history of the parties." Under Silver, a trial court must conduct a two-part analysis when determining whether to issue an FRO.[9] 387 N.J. Super. at 125-27. The court must first determine "whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125. The evidence must be considered "in light of whether there is a previous history of domestic violence, and whether there exists immediate danger to person or property." Id. at 126.

---

[9]   As a threshold matter, the trial court must determine whether the victim qualifies for protection under the PDVA based on the criteria established in N.J.S.A. 2C:25-19(d), which includes being "subjected to domestic violence" by a present or former "household member" or "a person with whom the victim has had a dating relationship." Jurisdiction under the PDVA is not disputed here.

A-4368-18

Following a finding of the commission of a predicate act, the court must then determine "whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(6), to protect the victim from an immediate danger or to prevent further abuse." Id. at 127. Factors set forth in N.J.S.A. 2C:25-29(a) include "[t]he previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;" "[t]he existence of immediate danger to person or property;" and "[t]he best interests of the victim . . . ." N.J.S.A. 2C:25-29(a)(1), (2), (4).

Harassment is one of the many predicate acts listed in the PDVA. N.J.S.A. 2C:25-19(a)(13). Pertinent to this appeal, N.J.S.A. 2C:33-4(a) provides that a person commits harassment "if, with purpose to harass another, he . . . [m]akes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm." To cause annoyance under subsection (a) "means to disturb, irritate, or bother." State v. Hoffman, 149 N.J. 564, 580 (1997).

To be sure, "subsection (a) proscribes . . . communicative conduct when its purpose is to harass." Ibid. (citing N.J.S.A. 2C:33-4(a)). "A finding of a purpose to harass may be inferred from the evidence presented" as well as from

"[c]ommon sense and experience." Id. at 577. Indeed, courts must be mindful that "a party may mask an intent to harass with what could otherwise be an innocent act," J.D. v. M.D.F., 207 N.J. 458, 488 (2011), and "must consider the totality of the circumstances to determine whether the harassment statute has been violated." H.E.S. v. J.C.S., 175 N.J. 309, 326 (2003) (quoting Cesare, 154 N.J. at 404). "Although a defendant might not use direct physical violence when he . . . engages in the predicate acts of harassment, N.J.S.A. 2C:33-4, . . . these acts can cause great emotional harm and psychological trauma." A.M.C. v. P.B., 447 N.J. Super. 402, 417 (App. Div. 2016).

Here, the judge concluded that plaintiff established she was subjected to acts of harassment by defendant in March 2019, and a restraining order was necessary to prevent further abuse. The judge properly applied the governing principles in considering the totality of the circumstances, including the January 18 altercation, to inform his analysis that defendant violated the harassment statute when he communicated with plaintiff in March 2019. In that regard, the judge rejected defendant's disingenuous explanations to mask his true intent and found that defendant had a purpose to harass from the evidence presented as well as common sense and experience. As the judge aptly noted, it was "classic domestic violence." We are satisfied the judge's findings are supported by and

22

consistent with the competent, relevant, and reasonably credible evidence in the record, and defendant's contrary assertions lack sufficient merit to warrant further discussion.  R. 2:11-3(e)(1)(A) and (E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

23